IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF FLORIDA
PENSACOLA DIVISION

BART FLEET, as Personal Representative of
the Estate of CALVIN WILKS, JR., deceased,

    Plaintiff,

v.                                         CASE NO.: 3:23-cv-09214-MCR-HTC

BRANDON HARDAWAY, in his individual and
official capacities, as City of Crestview's Police
Officer; WILLIAM JOHNS, II, in his individual
and official capacities, as City of Crestview's
Police Officer; EVAN REYNOLDS, in his
individual and official capacities, as City of
Crestview Police Officer; and STEPHEN
MCCOSKER, in his individual, supervisory
capacity and as City of Crestview's Chief of
Police, and THE CITY OF CRESTVIEW,
FLORIDA, a political subdivision of the State
of Florida,

    Defendants.
_____/

**DEFENDANT, EVAN REYNOLD'S MOTION TO DISMISS AND
MEMORANDUM OF LAW IN SUPPORT THEREOF**

COMES NOW, Defendant, EVAN REYNOLDS, by and through his undersigned counsel, and files this, his Motion to Dismiss Plaintiff's Complaint and Memorandum of Law in Support thereof and, pursuant thereto, states as follows:

I.    BACKGROUND

**A.    Allegations in the Complaint**

1.    On October 14, 2021, several members of the Crestview Police Department (each of the Defendants named in this suit plus Sgt. Michael Leadmon) responded to a disturbance call

1

at 354 Hospital Drive, a two-story apartment complex in Crestview, Okaloosa County, Florida (the "Residence").  Plaintiff's Complaint, ¶¶15-17, 19.

2. The Residence, at that time, was occupied by Calvin Wilks, Jr. ("Wilks"). Id. at ¶15.

3. Defendant Hardaway was the first to arrive at the scene at approximately 2:16 a.m. Id. at ¶16. Shortly thereafter, Defendant Johns arrived at the scene. Id. at ¶17. At approximately 2:25 a.m., Defendant Reynolds arrived at the scene. Id. at ¶19.

4. Upon Defendant Reynold's arrival, both Defendant Hardaway and Defendant Johns were in contact with Calvin Wilks, Jr., in the doorway of the Residence. Id. at ¶19. Defendant Reynolds positioned himself on the landing of the stairway leading up to the Residence. Id.

5. Defendant Hardaway repeatedly knocked on the door to the Residence, which was ultimately answered by Wilks. Id. at ¶21. Wilks initially denied access to the Residence but indicated that he would come outside to speak with the officers, at which time Wilks closed and immediately locked the door. Id.

6. After a few minutes, Wilks opened the front door again, where he was again encountered Defendant Hardaway. Id. at ¶22. Defendant Hardaway placed his hand against the door and placed his left foot inside the door frame to prevent Wilks from being able to close the door. Id. at ¶¶23-24.

7. Wilks began to "repeatedly and over the course [of] a couple of minute attempt to close the door, but was unable to do so due to the placement of [Defendant] Hardaway's foot inside of the door frame." Id. at ¶25. The Plaintiff further alleges that Wilks "continuously" tried to slam the door shut against Defendant Hardaway's foot. Id. at ¶32.

2

8.      At that time, Defendant Hardaway informed Wilks that he would not remove his foot from the door frame until he was able to determine that no criminal activity had occurred. Id.

9.      "At this point, Defendants, specifically including, but not limited to Hardaway, made a decision to enter [the Residence] and detain him." Id. at ¶34.

10.     Defendants Hardaway, Johns and Reynolds then entered the Residence and Defendant Hardaway and Johns took Wilks to the ground. Id. at ¶¶36-37.

11.     Defendant Reynolds commenced a search of the Residence to check for any threats and to determine if anyone needed assistance. Id. at ¶40. Defendant Reynolds found neither. Id.

12.     While Defendant Reynolds was searching the Residence, Defendants Hardaway and Johns began placing Wilks in mechanical (both wrist and ankle) restraints on the floor. Id. at ¶41. In doing so, Defendant Johns tased Wilks several times. Id. at ¶¶42-43.

13.     After Defendant Reynolds "cleared" the Residence, he assisted Defendants Hardaway and Johns in retraining Wilks. Id. at ¶43.

14.     "Due to what Defendants determined to be [Wilks] having a possible narcotic reaction and due to his shallow breathing, EMS and Fire were notified to respond to the scene." Id. at ¶44.

15.     "While on the scene, [Wilks] stopped breathing and CPR was administered by EMS and Fire." Id. at ¶45. "[Wilks] was transported to North Okaloosa Medical Center, where he was pronounced dead the following day (October 15, 2021)." Id.

B.      **911 Call and Body Camera Footage**

    1.     **911 Call**

16.     This incident started with a 911 call from the person living on the first floor (352 Hospital Drive), directly under the Residence. The caller stated that "they" had been "at it" for 15

minutes and that she heard bumping and hollering, and someone say "stop, please stop" coming from the Residence.  Crestview Police Department then dispatched the officers involved.  Exhibit 1.

    **2.**    **Body Camera Footage**

17.    Defendants Hardaway, Johns and Reynolds were each wearing body cameras at the time of this incident, which have all been properly preserved and produced by the City of Crestview.  These videos are attached hereto as follows: Exhibit 2 (Defendant Hardaway); Exhibit 3 (Defendant Johns) and Exhibit 4 (Defendant Reynolds).  Sgt. Mike Leadmon with the Crestview Police Department was also at the scene but is not named as a defendant.  His body camera video is attached hereto as Exhibit 5 (Sgt. Leadmon).  Each video contains both audio and video, is clear and easy to follow, and shows all the relevant conduct.  The videos show both a date/time stamp as well as a video timer.  For convenient reference, citations to the videos will be based on the timers on each video.  In the interest of full disclosure, all the videos have been submitted with this motion.  However, only two (2), Defendant Hardaway and Defendant Reynolds, and summarized below.

    **a.**    **Brandon Hardaway (the first to arrive)**

18.    Defendant Hardaway first knocked on the door of the Residence at 1:07, at 1:35 and again at 2:20.  He identified himself as Crestview Police Department at 2:20.  At 2:26 Wilks opened the door.  Defendant Hardaway then asked if he could come inside at which point Wilks stated that he would come outside.  Defendant Hardaway then stated: "whatever works for you."  Shortly thereafter, at 2:39, Wilks closed the door.  The door remained closed for approximately 5 minutes.  During that time, Defendant Hardaway stated that he could hear Wilks talking to somebody inside.  6:47.

19. At 7:18 Wilks opened the door again and stated: "I ain't got nothing, sir, for real." Defendant Hardaway then placed his boot in the threshold of the door. It is important to note here that Wilks' demeanor had changed during the 5-minute delay from appearing cooperative to being aggressive.

20. At 7:29 Wilks began trying to slam the door shut against Defendant Hardaway's boot. At 7:33, Defendant Hardaway informed Wilks that he was there based on a report of a possible disturbance. Wilks then stated: "This is not my house." At 7:44, Defendant Hardaway stated that he was not coming in the house but "I need to talk to you." At 8:05 Defendant Hardaway stated: "If you want me to go away, then talk to me." At 8:27, Defendant Hardaway stated: "We have a female yelling 'please stop.' So right now, I have to believe something might be going on." During this entire time, Wilks was continuously slamming the door against Defendant Hardaway's boot. At 8:42, Defendant Hardaway stated: "As soon as I know there is no criminal activity, that's when I will move my foot" and reiterated that he was there "for a lawful purpose." At 9:12, Wilks tried to physically remove Defendant Hardaway's boot from the threshold to which Defendant Hardaway stated: "Don't touch my feet." At 9:20, Defendant asked Wilks "Why are we getting calls about a female yelling 'please stop.'"

21. After it became obvious that Wilks was not going to talk to the officers, either inside or outside the apartment, at 10:03, the officers entered the Residence. Wilks then immediately began resisting the officers' efforts to handcuff him. During the struggle, Wilks was tased four (4) times (at 11.01, 11:10, 11:21 and at 11:35), within about 30 seconds. Wilks was fully handcuffed at 14:55 and, shortly thereafter, EMS personnel entered the Residence.

22. Defendant Hardaway left the Residence and went downstairs to talk with the neighbor who had called 911. He knocked on her door at 17:10. At 17:43, 18:58 and at 21:20, the

neighbor confirmed that she had earlier heard someone say "Stop, please stop." At 20:35 the neighbor confirmed that she thought someone was in trouble and needed help. Defendant Hardaway left the neighbor's apartment at 23:45.

23. At 33:12, Defendant Hardaway spoke to the tenant of the Residence, Amber Robertson. She identified Calvin as Wilks' first name and, at 34:10, stated that he was staying with her at the Residence. At 40:56, she stated that Wilks had dropped her off at work and, at 41:38, she denied having any altercation with Wilks that evening. Defendant Hardaway then left the scene.

### c. Defendant Reynolds (the third officer to arrive)

24. Defendant Reynolds arrived at the scene and exited his vehicle at 0:59. At 1:51 he positioned himself on the landing of the steps while Defendants Hardaway and Johns were at the front door. At 6:43 Wilks told the officers that this was not his house and at 7:00 Wilks stated that the woman who lives there was outside in her car. At 7:08 Defendant Reynolds looked in several cars in the parking lot and did not see anyone. He then proceeded to search the area behind the apartment building.

25. At 8:45, Defendant Reynolds entered the house with Defendants Hardaway and Johns. At 9:00, Defendant Reynolds is seen searching the back rooms of the Residence. At 9:45, Defendant Reynolds assisted in handcuffing Wilks, which Wilks was actively and aggressively resisting. At 11:29, Defendant Reynolds left the Residence to get additional restraints, returning approximately 1 minute later. Defendant Reynolds did not have any further physical contact with Wilks. The paramedics entered the Residence at 20:36.

**C.     Procedural History**

26.    In May 2023, Plaintiff filed a multi-count complaint under §1983 and under state law. The claims filed against Defendant Reynolds, individually, are Count I (unlawful arrest under 42 U.S.C. §1983), Count II (excessive use of force under 42 U.S.C. §1983), Count IV (state law claim for battery), Count V (state law claim for false arrest) and Count VIII (state law claim for wrongful death). The excessive use of force claim against Defendant Reynolds (Count II) is based on his alleged failure to intervene: "Defendant Reynolds took no corrective actions whatsoever in response to the actions of Defendants Hardaway and/or [Johns]." Plaintiff's Complaint, ¶60.

27.    Although the Plaintiff's Complaint does not specifically refer to the body camera videos, the very detailed allegations of the event, including specific times and length of times clearly indicate that the attorneys were relying on the body camera videos to draft the complaint. Before the paramedics arrived, there were no witnesses to this event other than the four (4) officers and Wilks himself. The complaint does specifically refer to a disturbance call. Id. at ¶16.

## II.     STANDARD OF REVIEW

28.    The law governing motions to dismiss pursuant to Rule 12(b)(6) (failure to state a claim) is well-settled. Dismissal of a complaint is appropriate "when, on the basis of a dispositive issue of law, no construction of the factual allegations will support the cause of action." Marshall County Bd. of Educ. v. Marshall County Gas. Dist., 992 F.2d 1171, 1174 (11th Cir. 1993). The Court accepts the plaintiff's allegations as true, Hishon v. King & Spalding, 467 U.S. 69, 73, 104 S.Ct. 2229, 81 L.Ed.2d 59 (1984), and considers the allegations in the complaint in the light most favorable to the plaintiff. Watts v. Fla. Int'l Univ., 495 F.3d 1289, 1295 (11th Cir. 2007). As set forth below, in the instant case, it is appropriate for the Court to also consider the attached body camera videos and 911 call recording in ruling on this motion.

### III.  CONSIDERATION OF BODY CAMERA FOOTAGE AND 911 CALL

29.  The Eleventh Circuit recently decided the case of Baker v. City of Madison, 67 F.4th 1268 (11th Cir. 2023) that directly addressed the consideration of body camera footage in deciding on a motion to dismiss involving qualified immunity.  In that case, the court noted that, generally, "when considering a motion to dismiss, the district court must limit its consideration to the pleadings and any exhibits attached to it." Id. at 1276 (*citing* Grossman v. Nationsbank, N.A., 225 F.3d 1228, 1231 (11th Cir. 2000).  However, there are two (2) exceptions to this rule: (1) the incorporation-by-reference doctrine and (2) judicial notice.  Id.  "Under the incorporation-by-reference doctrine, a court may consider evidence attached to a motion to dismiss without converting the motion into one for summary judgment if (1) 'the plaintiff refers to certain documents in the complaint,' (2) those documents are 'central to the plaintiff's claim,' and (3) the documents' contents are undisputed." Id.

30.  Here, although the body camera videos are not specifically referenced, the specificity of the factual allegations incorporated in the Plaintiff's complaint leaves no doubt that the body camera footage formed the basis of the allegations.  In addition, the body camera footage depicts the events that are central to the Plaintiff's claims.  Just as in the *Baker* case, the footage shows all the relevant conduct and is particularly clear here because (1) the area depicted in the footage was well-lit, (2) the footage presents both visual and audio depictions of the events that transpired, and (3) the viewer has a good angle of the events with no visual obstructions. *See* Id. at 1277.  Finally, there should be no honest challenge to the authenticity, integrity, and completeness of the body camera footage.

31. In addition, it is appropriate for the Court to take judicial notice of the body camera footage and the 911 call recording pursuant to Federal Rule of Evidence 201, which allows the Court to take judicial notice "at any stage of the proceeding."

## IV.   QUALIFIED IMMUNITY

32. Under the doctrine of qualified immunity, "government officials performing discretionary functions generally are shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." Harlow v. Fitzgerald, 457 U.S. 800, 818, 102 S. Ct. 2727, 2738 (1982).  Qualified immunity balances two important public interests: "the need to hold public officials accountable when they exercise power irresponsibly and the need to shield officials from harassment, distraction, and liability when they perform their duties reasonably." Pearson v. Callahan, 555 U.S. 223, 231, 129 S. Ct. 808, 815 (2009).  When a government official raises the "defense of qualified immunity, we first consider whether the defendant government official has proved that he was acting within the scope of his discretionary authority when the alleged wrongful act occurred." Gonzalez v. Lee Cnty. Hous. Auth., 161 F.3d 1290, 1294–95 (11th Cir. 1998) (alteration and quotation marks omitted).  "Once the defendant establishes that he was acting within his discretionary authority, the burden shifts to the plaintiff to show that qualified immunity is not appropriate." Lee v. Ferraro, 284 F.3d 1188, 1194 (11th Cir. 2002).  "To overcome a qualified immunity defense, the plaintiff must make two showings." Christmas v. Harris Cnty., 51 F.4th 1348, 1354 (11th Cir. 2022) (quotation marks omitted).  "First, the plaintiff must establish that the defendant violated a constitutional right." Id. (emphasis and quotation marks omitted).  "Second, the plaintiff must show that the violation was clearly established." Id. (emphasis and quotation marks omitted).  "Both elements must be satisfied for an official to lose qualified immunity."

Grider v. City of Auburn, 618 F.3d 1240, 1254 (11th Cir. 2010). The Court may analyze these two elements in whatever order is most appropriate for the case. Pearson, 555 U.S. at 236, 129 S. Ct. at 818.

33. The Fourth Amendment "right of people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated…." *U.S. Const. amend. IV*; Hall v. Smith, 170 F. App'x 105, 106 (11th Cir. 2006). However, a warrantless entry may be justified where there is both probable cause and exigent circumstances. United States v. Dabrezil, 603 F. App'x 756, 758 (11th Cir. 2015). "In order to be entitled to qualified immunity from the Fourth Amendment claim, an officer need not have actual probable cause but only 'arguable probable cause,' i.e., the facts and circumstances must be such that the officer reasonably could have believed that probable cause existed." Montoute v. Carr, 114 F.3d 181, 184 (11th Cir. 1997). Exigent circumstances exist where "there is a compelling need for official action and not time to secure a warrant." Hall, 170 F. App'x at 758. This is achieved when the officers have an objectively reasonable basis to believe that an individual inside is seriously injured, under threat of injury, or in need of serious aid. Id. at 759.

34. In the instant case, the officers knew that there was a 911 call that reported bumping and yelling and knew that the caller heard someone inside the Residence say "stop, please stop." When they first encountered Wilks, he indicated that he was alone in the apartment but agreed to come outside to talk with them before he then closed and locked the door. Defendant Hardaway reported hearing voices inside the Residence and, when Wilks returned, his demeanor had changed drastically. He was clearly no longer willing to come outside to speak with Defendant Hardaway. He also informed Defendant Hardaway that the Residence was not his residence: "This is not my

10

house." Therefore, it was objectively reasonable for Defendant Hardaway to place his boot on the threshold to prevent Wilks from again closing and locking the door.

35. Once that occurred, Wilks committed a battery on a law enforcement officer by repeatedly slamming the door against Defendant Hardaway's boot and trying to physically remove his foot from the threshold.  See §§784.03, 784.07, *Florida Statutes*.  In committing this battery, Wilks was attempting to prevent Defendant Hardaway from properly investigating the 911 call in furtherance of his duties as a police officer.  Pursuant to §776.051(1), *Florida Statutes*, "[a] person is not justified in the use … of force to resist an arrest by a law enforcement officer, or to resist a law enforcement officer who is engaged in the execution of a legal duty, if the law enforcement officer was acting in good faith and he or she is known, or reasonably appears, to be a law enforcement officer."  In the instant case, Wilks was not justified in using force (battery) in his attempt to prevent Defendant Hardaway from executing his legal duty as a police officer. Therefore, the Plaintiff's false arrest claim must fail.

36. After the officers entered the Residence, it was clear that Wilks resisted Defendants Hardaway and Johns' attempt to secure his hands and feet with cuffs.  Defendant Reynolds immediately began searching the Residence.  While Defendant Reynolds was in a back room, Defendant Johns "dry" tased Wilks for the first time.  Wilks was tased three additional times during the struggle.  Wilks was not tased after he was secured in cuffs.

37. As stated, the Plaintiff's claim against Officer Reynolds for excessive force centers around his alleged failure to intervene the use of the taser by Defendant Johns.  It is conceded that "an officer can be liable for failing to intervene when another officer uses excessive force." Priester v. City of Riviera Beach, 208 F.3d 919, 924 (11th Cir. 2000).  Specifically, "an officer who is present at the scene and who fails to take reasonable steps to protect the victim of another

officer's use of excessive force can be held liable for his nonfeasance." <u>Velazquez v. City of Hialeah</u>, 484 F.3d 1340, 1341 (11th Cir. 2007). This claim fails for two reasons. First, Defendant Johns' use of the taser did not constitute excessive force and, therefore, Defendant Reynolds had no obligation to intervene. *See* <u>Crenshaw v. Lister</u>, 556 F.3d 1283, 1294 (11th Cir. 2009) (explaining that there is "no attendant obligation to intervene" if the other officer's force is not excessive).

38. Second, even assuming Defendant Johns' use of the taser was excessive, Defendant Reynolds did not have the ability to intervene to prevent that use of force. Wilks was tased twice while Defendant Reynolds was in another room. Wilks was then tased twice more while he was actively resisting arrest (struggling against Defendants Hardaway and Johns) as Defendant Reynolds arrived back in the room to assist with securing Wilks. In addition, there is no allegation that Defendant Reynolds independently applied excessive force and there was no such force depicted on the body camera footage. Therefore, the excessive force claim against Defendant Reynolds must fail.

## V.  STATUTORY IMMUNITY

39. Defendant Reynolds is entitled to statutory immunity on the common law battery claim:

> An officer … may not be held personally liable in tort or named as a party defendant in any action for any injury or damage suffered as a result of any act, event, or omission of action in the scope of her or his employment or function, unless such officer … acted in bad faith or with malicious purpose or in a manner exhibiting wanton and willful disregard of human rights, safety, or property.

§768.28(9)(a), *Florida Statutes*. In addition, "[p]ursuant to Florida law, police officers are entitled to a presumption of good faith in regard to the use of force applied during a lawful arrest, and officers are only liable for damages where the force used is 'clearly excessive.'" <u>Davis v. Williams</u>,

451 F.3d 759, 768 (11th Cir. 2006). Because Defendant Reynolds did not use force any force against Wilks that could be construed as excessive, the Plaintiff's common law battery claim must fail. This same immunity would apply to the Plaintiff's false arrest and wrongful death claims, which should be dismissed based on the body camera videos submitted.

## VI.   CONCLUSION

40. Based on the foregoing, Defendant, EVAN REYNOLDS, moves to dismiss with prejudice all claims brought against him in his individual capacity.

Respectfully submitted this 5th day of July, 2023.

**BOWMAN LAW**

/s/   J. Bruce Bowman
J. BRUCE BOWMAN (FBN: 0781959)
5535 John Givens Road
Crestview, FL 32539
(850) 428-1755
(866) 601-5494 (fax)
bruce@emeraldcoastlawyers.com
Attorney for Defendant, Reynolds

13

## CERTIFICATE OF SERVICE

      I HEREBY CERTIFY that a true and correct copy of the foregoing has been furnished via the Court's CM/ECF on this 5th day of July, 2023 to:

Daniel J. Finelli, Esq.  
Daniel M. Soloway, Esq.  
Soloway Law Firm  
1013 Airport Blvd.  
Pensacola, FL 32504  
Email: d.finelli@solowaylawfirm.com  
        d.soloway@solowaylawfirm.com  
Attorneys for Plaintiff

Gillis Edward Powell, Esq.  
Powell Law Firm  
422 N. Main Street  
P.O. Box 277  
Crestview, FL 32536-0277  
Email: gillpowell@powelllawfirm.com  

Attorney for Plaintiff

Zackery A. Scharlepp, Esq.  
Nichola A. Lecakes, Esq.  
Coppins Monroe, PA  
1319 Thomas Drive  
Tallahassee, FL 32308  
Email: zascharlepp@coppinsmonroe.com  
        nlescakes@coppinsmonroe.com  
Attorneys for Defendants,  
McCosker and City of Crestview

William Peter Martin, Esq.  
Dennis, Jackson, Martin & Fontela, PA  
1591 Summit Lake Drive, Suite 200  
Tallahassee, FL 32317  

Email: peter@djmf-law.com  

Attorney for Defendants,  
Hardaway and Johns

**BOWMAN LAW**

/s/   J. Bruce Bowman  
J. BRUCE BOWMAN (FBN: 0781959)  
5535 John Givens Road  
Crestview, FL 32539  
(850) 428-1755  
(866) 601-5494 (fax)  
bruce@emeraldcoastlawyers.com  
Attorney for Defendant, Reynolds

## EXHIBITS
(To be provided to Clerk on separate thumb drive)

Exhibit 1:  a.  911 call to Okaloosa County (.wav file)
            b.  911 call transfer to Crestview (.wav file)

Exhibit 2:  Body Camera Video (Defendant Brandon Hardaway) (.mp4 file)

Exhibit 3:  Body Camera Video (Defendant William Johns, II) (.mp4 file)

Exhibit 4:  Body Camera Video (Defendant Evan Reynolds) (.mp4 file)

Exhibit 5:  Body Camera Video (Sgt. Michael Leadmon) (.mp4 file)