## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF FLORIDA
## PENSACOLA DIVISION

**BART FLEET,** as Personal Representative
of the Estate of CALVIN WILKS, JR.,

     Plaintiff,

v.                      CASE NO.: 3:23-cv-09214-MCR-HTC

**BRANDON HARDAWAY**, in his
Individual and official capacities as
City of Crestview's Police Officer;
**WILLAM JOHNS, II**, in his individual
and official capacities, as City of Crestview's
Police Officer; **EVAN REYNOLDS**, in his
Individual and official capacities as City of
Crestview's Police Officer; and **STEPHEN
MCCOSKER**, his individual, supervisor
Capacity, and as City of Crestview's Chief
of Police; and **THE CITY OF CRESTVIEW,
FLORIDA**, a political subdivision of the state
of Florida,

     Defendants.

_____/

## DEFENDANTS, BRANDON HARDAWAY AND WILLIAM JOHNS, II'S, MOTION TO DIMSISS COUNTS I, II, III, IV, V, AND VIII OF PLAINTIFF'S COMPLAINT

     Defendants, BRANDON HARDAWAY, and WILLIAM JOHNS, II, by and

through undersigned counsel, and pursuant to Rule 12(b)(6), Fed. R. Civ. P., hereby

move to dismiss Counts I, II, III, IV, V, and VIII of Plaintiff's Complaint. In support

thereof, Defendants Hardaway and Johns state as follows:

## A. INTRODUCTION

### I. Statement of Alleged Facts

On May 2, 2023, Plaintiff filed an eight-count Complaint asserting various claims against Stephen McCosker, City of Crestview's Chief of Police; the City of Crestview; and three individual Crestview Police Officers; Brandon Hardaway, William Johns, II, and Evan Reynolds.

Plaintiff's Complaint asserts claims against Defendants Brandon Hardaway (Hardaway) and William Johns, III (Johns), and collectively Defendants. The Complaint alleges claims for Unlawful Arrest (Count I), Excessive Force of Hardaway and Johns (Counts II and III), State Law Claim for Battery (Count IV), State Law Claim for False Arrest (Count V), and State Law Claim for Wrongful Death (Count VIII).

These claims against Hardaway and Johns all arise out of the arrest of Calvin Wilks, Jr. ("Wilks") in the early morning hours of October 14, 2021. The alleged events began with a 911 reporting a "disturbance call" at an apartment where Wilks was located. Defendants were wearing body-worn cameras at all times relevant to this action from the time Hardaway and Reynolds first arrived at the apartment, to the time Wilks is laying on the floor of the apartment in handcuffs and leg restraints, with EMS attending to him.

## II.   Standard of Review

Dismissal of a complaint is appropriate "when, on the basis of a dispositive issue of law, no construction of the factual allegations will support the cause of action." Marshall Cty. Bd. Of Educ. v. Marshall Cty. Gas. Dist., 992 F.2d 1171, 1174 (11th Cir. 1993). The court accepts the plaintiff's allegations as true, Hishon v. King & Spalding, 467 U.S. 69 (1984), and considers the allegations in the complaint in the light most favorable to the plaintiff. Watts v. Fla. Int'l Univ., 495 F.3d 1289, 1295 (11th Cir. 2007).

As further discussed below, it is appropriate for this Court to consider the attached body-worn camera footage and 911 call recording in ruling on this motion. The video footage is uncontroverted evidence, and the Court should view the facts in the light depicted by the video recording.

## III.   It is proper for this Court to consider the Body-Worn Camera Footage and 911 call recording in ruling on this Motion to Dismiss.

In its recent opinion in Baker v. City of Madison, et al., 67 F. 4th 1268 (11th Cir. 2023), the Eleventh Circuit held that "[u]nder the incorporation-by-reference doctrine, a court may consider evidence attached to a motion to dismiss without converting the motion into one for summary judgment: (1) 'the plaintiff refers to certain documents in the complaint,' (2) those documents are 'central to the plaintiff's claim,' and (3) the documents' contents are undisputed." Id., at 1276 (quoting Horsley v. Feldt, 304 F.3d 1125, 1134 (11th Cir. 2002) (other citation

omitted). The Court in <u>Baker</u> also explained that "[e]vidence is 'undisputed' in this context if its authenticity is unchallenged." <u>Id.</u> at 1276 (*citing* <u>Grossman v. Nationsbank, N.A.</u>, 225 F.3d 228, 1231 (11th Cir. 2000).

There are two exceptions to this rule, however, which include the incorporation-by-reference doctrine, and judicial notice. <u>Id.</u> "Under the incorporation-by-reference doctrine, a court may consider evidence attached to a motion to dismiss without converting the motion into one for summary judgment if (1) 'the plaintiff refers to certain documents in the complaint,' (2) those documents are 'central to the plaintiff's claim,' and (3) the documents' contents are undisputed." <u>Id.</u>

Here, although the body-worn camera videos are not specifically referenced, the specificity of the factual allegations incorporated into Plaintiff's Complaint, along with verbatim quotes which could only have been taken from the body-worn camera videos, leaves no doubt that the body-worn camera footage formed the basis of Plaintiff's allegations. In fact, just as in the <u>Baker</u> case, the footage referenced shows all of the relevant conduct and there is no honest challenge to the authenticity, integrity, and completeness of the body-worn camera footage.

Additionally, it is appropriate for the Court to take judicial notice of the body-worn camera footage pursuant to Federal Rule of Evidence 201, which allows the Court to take judicial notice "at any stage of the proceedings."

Defendants also request that the 911 call be incorporated by reference for purposes of the instant motion. Although not explicitly identified as a 911 call in Plaintiff's Complaint, it alleges a "disturbance call" and specifically alleges that Defendants "Hardaway and Johns arrived at the scene in reference/response to a disturbance call." Id., ¶¶ 16 and 17; see also ¶19.

The 911 caller stated she "wanted to report a disturbance upstairs at 352 Hospital Drive…[that] they have been at it for about 15 minutes now…and they're about to start up again…;" she further reported hearing "a lot of bumping and hollering …can't really what they're saying…heard somebody saying stop once, please stop." See 911 call, **attached hereto as Exhibit "A".**[1] This 911 call should be incorporated by reference as Plaintiff alleges and identifies it in the Complaint referring to it as a "disturbance call," and its authenticity and reliability are well-established and not disputed.

In Navarette v. California, 572 U.S. 393 (2014), a 911 caller "reported an erratic vehicle on a roadway, and an 'investigatory stop' of the vehicle was made by law enforcement. The court in Navarette held the 911 call was reliable as it "bore adequate indicia of reliability for the officer to credit the caller's account." Id., at 398-99. In United States v. Bruce, 977 F.3d 1112 (11th Cir. 2020), an "anonymous

---

[1] Exhibits A-C will be placed on a thumb drive and hand delivered to the Clerk's Office on August 8, 2023.

911 call giving eyewitness details of a real-time event is reliable enough 'to credit the caller's account.'" Id., at 1117 (*quoting* Navarette, *supra*, at 398. While the 911 caller here is not an "eyewitness," she was clearly able to hear what was happening and being said in the apartment above her, which had been going for about "15 minutes," and she also reported hearing "bumping" noises, and someone saying, "stop…please stop." Given the 911 caller's location in the apartment below, and her ability to hear noises and things being said, her report to 911 is no less reliable than an eyewitness account.

In Navarette the court found it significant that the fact someone makes a 911 call is an "indicator of veracity as the "911 emergency system…has some features that allow for identifying and tracing callers, and thus provide some safeguards against making false reports with immunity… [making it] one of the relevant circumstances that, taken together, justified the officer's reliance on the information reported in the 911 call." Id., at 400-401.

Thus, what the 911 caller heard should be deemed no less reliable than an eyewitness account as her report was contemporaneous with what was happening and being said, making no less reliable than an eyewitness account. In United States v. McCall, 563 Fed. Appx. 696, (11th Cir. 2014), the court held that "[r]easonable suspicion may be based on information supplied by another person, as long as the information bears sufficient indicia of reliability." Id., at 700 (*citing* Adams v.

<u>Williams</u>, 407 U.S. 143, 146-47 (1972)). Here, the information provided in the 911 call was sufficiently reliable for Hardaway and Johns to go to the apartment to investigate potential criminal activity.

Therefore, this Court should find that the 911 call is incorporated by reference in Plaintiff's complaint as it has a sufficient indicium of reliability for purposes of Hardaway and Johns' motion to dismiss.

## IV.    Timeline of Events

The body-worn camera footage has been properly preserved and produced by the City of Crestview. Each video contains both audio and video, is clear and easy to follow, and depicts all relevant conduct as referenced within Plaintiff's Complaint. For convenient reference, citations to the videos will be based on the timers, as opposed to the actual time.

Defendant Hardaway first knocked on the door to the Residence at 1:07, again at 1:35, and again at 2:20. At 2:26, a man who is later identified to be Calvin Wilks, Jr., decedent, opened the door. Defendant Hardaway identified himself as an officer with Crestview Police Department and asked Wilks to come in. Wilks initially declined and stated he would come outside. Defendant Hardaway then stated, "whatever works for you," and waited outside after Wilks shut the door. The door remained closed for approximately five (5) minutes. During this time, Defendant Hardaway hears a male voice talking to someone inside the Residence. <u>See</u>

Hardaway's Body-Worn Camera Footage, **attached hereto as Exhibit "B."**

At 7:18, Wilks opened the door again and his demeanor had drastically changed during the five (5) minute delay from appearing cooperative, so now appearing aggressive. Wilks, immediately upon re-opening the door, stated "I ain't got nothing, sir, for real." Defendant Hardaway then placed his boot in the threshold of the door to prevent Wilks from closing the door again. Id.

At 7:29, Wilks began attempting to slam the door shut on Defendant Hardaway's foot. Defendant Hardaway tells Wilks, "I'm not coming in your house...but I need to talk to you." Wilks continues attempting to slam the door shut. Defendant Hardaway then asks, "why are we getting calls about yelling and screaming..." Id. Wilks continues pushing against the door in an attempt to close it, and Defendant Hardaway informs Wilks that he is there based on the report of a disturbance, to which Wilks states "this is not my house." Id. at 7:29-7:43. At 8:27, Defendant Hardaway stated: "We have a female yelling 'please stop.' So right now, I have to believe something might be going on." Id. During this entire encounter, Wilks is continuously slamming the door against Defendant Hardaway's boot. At 8:42, Defendant Hardaway advised Wilks "as soon as I know there is no criminal activity, that is when I will move my foot" and reiterated that he was there "for a lawful purpose."

Wilks tells Defendant Hardaway that "the girl is right there...the girl that lives

here, her name is Amber." Defendant Hardaway then tells Defendant Reynolds, "if you want to talk to her to make sure we're good," after which Defendant Reynolds begins searching for "Amber" in the parking lot. Wilks advised that she was "in a car downstairs" and references a "gray one right down there." Id. at 8:07-8:30. At this point, Wilks begins to become more agitated and aggressive, using his entire body to slam against the door. Id. at 9:38.

Defendant Reynolds then confirmed that "Amber" was not present in the parking lot as stated by Wilks. See Evan Reynolds Body-Worn Camera Footage, **attached hereto as Exhibit "C"**, at 7:05-8:30. When it was confirmed that "Amber" was not present and when it became clear Wilks was not going to cooperate or speak with the officers, Defendants Hardaway, Johns, and Reynolds entered the Residence. Id. at 10:03. Wilks immediately began violently resisting the officers' efforts to handcuff and detain him. Id.

During the officers' efforts to detain Wilks, Officer Johns then utilized his department issued Taser in drive-stun mode (i.e., not with the neuromuscular incapacitation probes), four (4) times in an effort to obtain compliance from Wilks. Id. at 11:01, 11:10, 11:21, and 11:35. During the times Wilks was tased, he was never fully handcuffed (officers were only able to grab one hand, as Wilks refused to allow them to grab his left arm), he was never in leg restraints, and was otherwise never fully detained until 14:55, well after the taser applications. Id. Shortly

thereafter, EMS personnel entered the Residence. Id.

Defendant Hardaway then exited the Residence to speak with the downstairs neighbor who had called 911. Id. He knocked on her door at 17:10. During the conversation, she confirmed she heard someone say "stop, please stop" and that she thought someone was in trouble and needed help. Id. at 17:43-23:45. At 33:12, Defendant Hardaway spoke to Amber Robertson, the actual tenant of the subject Residence. She identified Wilks by his first name only, "Calvin," and advised he was staying with her at the Residence. At 40:56, she stated that Wilks had dropped her off at work and denied having an altercation with Wilks that evening. Id. at 41:38.

## B.    MEMORANDUM OF LAW

## I.    Counts I and II of Plaintiff's Complaint should be dismissed due to qualified immunity.

### a.    Count I – Unlawful Arrest

Count I of Plaintiff's is a claim for unlawful arrest against Hardaway and Johns under section 1983 U.S.C. § 1983. In Caldwell v. Albano, 2018 WL 3568 (S.D. Fla. 2018), a 911 caller reported a "domestic incident" involving plaintiff (male) and a woman who were "possibly intoxicated [and] fighting and running in and out of plaintiff's apartment." Id., *2. The court noted that "the existence of probable cause at the time of the arrest is an absolute bar to a subsequent constitutional challenge for the arrest." Id., at *3. The court further that even in "the

absence of probable cause, 'a police officer is entitled to qualified immunity if he had only 'arguable probable cause to arrest plaintiff." Id., *4 (*quoting* Gates v. Khokhar, 884 F.3d 1290, 1298 (11th Cir. 2018)).

The undisputed facts provided by the body-worn camera footage clearly show that Hardaway and Johns had probable cause to arrest Wilks based his refusal to exit the apartment to answer questions related to the information provided in the 911 call reporting 'bumping noises" and someone saying, "Stop…please stop." The overriding concern of the officers was whether there was a woman in the apartment, and the status of her physical/medical condition. Based on this information, in combination with Wilks' continuous slamming of the door against Hardaway's foot (Battery on a Law Enforcement Officer, F.S. 784.07), and his refusal to exit the apartment, the officers had both reasonable suspicion and probable cause to enter the apartment and arrest Wilks based on these concerns, and his increasing violence and refusal to obey lawful commands.

There is no dispute that Hardaway and Johns were acting "within the scope of their discretionary authority," See Complaint, ¶¶ 11, 76, 78, 85, 87, and 127. In addition, the body-worn camera footage shows that the officers did not violate any clearly established rights, and had probable cause (or "arguable probable cause") to arrest Wilks. A court is "required to grant qualified immunity to [defendants] unless the plaintiff can demonstrate: (1) that the facts, when construed in the plaintiff's

favor, show that the official committed a constitutional violation and, if so, (2) that the law, at the time of the official's act, clearly established the unconstitutionality of that conduct." Thorkelson v. Marceno, 840 Fed. Appx. 879, 882 (11th Cir. 2021), (*quoting* Singletary v. Vargas, 804 F.3d 1174, 1180 (11th Cir. 2015). The evidence here shows that there was probable or arguable probable to arrest Wilks, and is thus a complete bar to Plaintiff's unlawful arrest claims against Hardaway and Johns, and the absence of any evidence showing the violation of any clearly established rights. Based on the facts and applicable law, Hardaway and Johns are entitled to qualified immunity on Plaintiff's claims against them for unlawful arrest. See Baxter v. Roberts, 54 F. 4th 1241, 1255-56 (11th Cir. 2022).

### b.    Count II – Excessive Force

Count II of Plaintiff's Complaint is a claim for excessive force by Defendants Hardaway and Johns. Claims of excessive force are "properly analyzed under the Fourth Amendment's 'objective reasonableness' standard." Terrell v. Smith, 668 F.3d 1244, 12450 (11th Cir.2012) (*quoting* Graham v. Connor, 490 U.S. 386, 388 (1989)). "In determining the reasonableness of the force applied, [courts] look at the fact pattern from the perspective of a reasonable officer on the scene with knowledge of the attendant circumstances and facts, and balance the risk of bodily harm to the suspect against the gravity of the threat the officer sought to eliminate." Id., at 1251 (*quoting* McCullough v. Antolini, 559 F.3d 1201, 1206 (11th Cir.2009)(additional

citations omitted).

In <u>Graham,</u> the court explained that "[t]he calculus of reasonableness must allow for the fact that police officers are often forced to make split-second judgments, often times in tense circumstances, about the amount of force that is necessary in a particular scenario." <u>Id.,</u> at 397. In assessing and balancing "the necessity of the use of force…against the arrestee's constitutional rights, a court must evaluate several factors, including: (1) the severity of the crime at issue, (2) whether the suspect poses an immediate threat to the safety of the officers or others, and (3) whether he is actively resisting arrest or attempting to evade arrest by flight." <u>Brown v. City of Huntsville, Ala.,</u> 608 F.3d 724, 738 (11th Cir. 2010) (*quoting* <u>Vineyard v. Wilson,</u> 311 F.3d 1340 (11th Cir. 2002)).

In <u>Hinson v. Bias,</u> 927 F.3d 1103 (11th Cir. 2019), the plaintiff stabbed an individual, and police responded to the location finding plaintiff in the process of exiting from a parking garage. <u>Id.,</u> at 1109. The officers approached plaintiff's vehicle with guns drawn and one officer "commanded Hinson to keep his hands up and get out of the truck…Hinson did not respond…but eventually opened the truck's door…[and] 'finally put one leg on the ground,'" and was then "extracted" from the truck by one of the officers." <u>Id.</u> One of the officers told plaintiff "to turn around and face away from him, so [the officer] could handcuff [him]," but plaintiff continued "walking towards" the officer; he was again told "to stop and turn around…" but

"again did not comply." Id. The officers did not know whether plaintiff was armed, and an officer "then grabbed [plaintiff's] wrist and shoulder and performed a police maneuver known as a 'straight arm bar takedown." Id. The plaintiff was placed "in a prone position on the ground…[an officer] attempted to handcuff [plaintiff]…," but could not as plaintiff kept his hands under his body. Id.

Thereafter, one of the officers made "five or six hammer strikes to [plaintiff's] upper-mid back area…[and] another officer "gave one pain compliance strike to [plaintiff's] face…[and plaintiff] then released his hands from underneath his body," and was then handcuffed. Id. at 1109-1110. The court found that "the video [was], for the most part, not inconsistent with the officers' description of what occurred during the arrest." Id., at 1110. The court in Hinson held that the officers' actions in taking plaintiff under control were reasonable and did not violate [plaintiff's] Fourth Amendment right to be free from the use of excessive force in securing an arrest," and absent such violation, the officers were entitled to qualified immunity on [plaintiff's] Fourth Amendment claim." Id., at 1112.

As in Hinson, Wilks refused Hardaway and Johns' orders to stop resisting their efforts to handcuff him, and continued to strenuously fight against their efforts to handcuff him, including placing his arm under his body (as in Hinson) to keep from being handcuffed. Hardaway and Johns used reasonable force to bring Wilks under control, which force did not violate Wilks' rights under the Fourth

Amendment.

In assessing use of force claims, courts do not "sit in judgment to determine whether an officer made the best or a good or even a bad decision in the manner of carrying out an arrest." Buckley v. Haddock, 292 Fed. Appx. 791, 794 (11th Cir. 2008). Rather, "[t]he court's task is only to determine whether an officer's conduct falls within the outside borders of what is reasonable in the constitutional sense…[which] determination is made by looking at the totality of the circumstances." Id., at 794. Moreover, the force applied by an officer "'must be reasonably proportionate to the need for that force,' as measured by, among other factors, the danger posed to officers at the scene." Thorkelson v. Marceno, *supra* (*quoting* Shaw v. City of Selma, 884 F.3d 1093, 1099 (11th Cir. 2018)). As in the instant action, the plaintiff in Thorkelson "was behaving erratically and ignoring the officers' repeated requests to disarm and come out of her apartment." Thorkelson, v. Marceno, *supra*, at 882.

The bodycam evidence here plainly shows that Hardaway made multiple and repeated requests that Wilks come out of the apartment and talk to the officers. Instead, Wilks chose to continue slamming the door forcefully against Hardaway's foot. The larger and more important context of the force used by Hardaway and Johns is the fact that there is, or may be an individual in the apartment whose condition is unknown to them. This concern was only heightened by the fact that

"Amber" was not found in a car in the parking lot, and could therefore could still be in the apartment.

   **c.    Counts I and II of Plaintiff's Complaint should be dismissed because Defendants Hardaway and Johns are entitled to qualified immunity.**

For purposes of a qualified immunity defense, "the Court considers only the facts that were knowable to the defendant officers," which in the instant action  was the 911 call reporting potential domestic violence. White v. Pauly, 580 U.S. 73, 76-77 (2017). In Flowers v. City of Melbourne, 557 Fed. Appx. 893 (11th Cir. 2014), the police were faced with a person who had disobeyed three orders to stop approaching an officer who then kicked him

> in the solar plexus and knocked him off his feet…[the officer] then tried flipping him over on his stomach… but Flowers 'struggled and resisted [and the officer] then struck him three to four times with a closed fist and then succeeded in flipping him onto his stomach…[and] although the officer tried to secure Flowers with handcuffs, Flowers hid his arms under his chest and continued to resist…back-up was then called…[and when] the second officer arrived…and drew his Taser,' however the "first officer told him not to use it yet…one of the new officers attempted to perform a knee spike on the outside of Flowers' right thigh but hit the first officer instead…at that point, one of the officers tased Flowers and also employed a 'drive-stun' for approximately one and one-half seconds…[and] immediately the officers were able to secure Flowers.

Id., 894-95.

The court in Flowers noted "it is well established that the right to make an arrest or investigatory stop necessarily carries with it the right to use some degree of physical coercion or threat thereof to effect it.'" Id., at 895 (quoting Graham v.

Connor, *supra*, at 396). The plaintiff in Flowers argued that he was suffering from "mental infirmities," but the court found that the officers involved were completely without knowledge as to any such infirmities. Id.

Plaintiff also argued that Wilks "appeared to be under the influence of narcotics to all Defendants present at the scene," however there is not a scintilla of record evidence at this stage which shows or suggests that Hardaway or Johns (or any other officers at the scene) knew or should have known that Wilks' actions and behavior were due to narcotics. See Complaint, ¶ 35. The fact that his demeanor changed from the initial encounter to the second encounter, does not alone inform or put them on notice that narcotics were involved. Notwithstanding his increased anger and physical aggression, Wilks was able to engage with Hardaway verbally in a coherent manner, including being able to tell Hardaway that "Amber" was in a gray car in the parking lot. Despite the fact that this report turned out to be incorrect, it is nevertheless reasonable to believe that Amber had been in a car in the parking lot before Hardaway, Johns, and Reynolds arrived at the apartment; or that she could have been in a car when they arrived at the apartment, and then left the scene.

In Pena v. Marcus, et al., 715 Fed. Appx. 981 (11th Cir. 2017), the plaintiff claimed that the deputies violated her Fourth Amendment rights "when they forcibly entered her home." Id., at 985. In Pena, the deputies "knocked on the door, request[ed] permission to enter before ramming the door," but plaintiff claimed,

"that they should not have forcibly entered the home." Id. The Fourth Amendment allows "police [to] forcibly enter a residence if there is an exigency …" which is "determine[d] by conducting a totality of the circumstances analysis based on the facts that the police knew at the time of the search." United States v. Banks, 540 U.S. 31, 40 (2003). As above, Hardaway and Johns' primary concern at all times was whether there was a woman was in the apartment, and her condition. Hardaway and Johns gave Wilks multiple opportunities to come out of the apartment and talk to them, which he initially agreed to do, but then adamantly refused with increased anger and belligerence. Then, once inside, Wilks refused to be handcuffed and violently resisted being detained.

Based on the information provided by the 911 call, together with Wilks' conduct when questioned by Hardaway, his forceful slamming of the door against Hardaway's foot multiple times, his physical and combative resistance to being detained, leading to Johns' deployment of a drive-stun, the force used by Hardaway and Johns to arrest Wilks, was measured and reasonable under the circumstances.

The facts in Lowe v. Smith, 759 Fed. Appx. 797 (11th Cir. 2018) are similar to those here, when a 10-year-old called 911 saying, "my dad is killing my brother." Id., at 800. The boy "sounded hysterical, and the dispatcher mistook the word 'brother' for 'mother.'" Id. When police arrived, they "knocked on [plaintiff's] door, stat[ing] that she was with the Conyers Police Department, and ordered [plaintiff] to

open the door." Id. Plaintiff opened the door [but] not all the way, [and] not enough to show his entire body…[and he] appeared sweaty" to the officer. Id.

The officer then "commanded, '[h]ave your wife come out," but the plaintiff told the officer that his wife was at work; at which point the officer "ordered [plaintiff] to step outside, but [plaintiff] refused, 'stating, why? I didn't call you, and I don't have to. Tell me what you want.'" Id. The officer informed plaintiff that "the police had 'received a 911 call from this location…[and asked plaintiff] is there a young person here?'" Id. The plaintiff in Lowe eventually opened the door allowing the officer to see [the 10-year-old son] "who appeared uninjured…[the officer] then twice commanded [plaintiff], 'I need you to step out,' but [plaintiff] refused to do so and argued with [the officer], saying 'I don't have to step out. Because I didn't call you, I own this house, and you can't make me do that." Id.

Another officer then arrived who also ordered the plaintiff "to come out" which plaintiff again refused to do, and the officer told plaintiff, "You're out here fighting with your wife. You're going to get Tased." Id. A "scuffle [then] ensued in which the [second officer] violently pushed the front door even farther open, elbowed [plaintiff] in the side of the head, and grabbed his shoulders." Id., at 800-01. The first officer "reached under the [second officer's] arm and discharged her Taser on [plaintiff's] abdomen." Id. The scuffle "lasted about thirty seconds and ended with the [second officer] handcuffing [plaintiff]." Id., at 801. The officers then

spoke with the son who explained that he didn't say "my mom; you probably heard me wrong." Id.

The court in Lowe explained that "[e]ven when the officer has probable cause to believe a person has committed a crime…warrantless arrests inside a home are 'presumptively unreasonable.'" Id. (*quoting* Payton v. New York, 445 U.S. 573, 586 (1980). The court then added, "[n]evertheless, an in-home warrantless arrest may still be reasonable under the Fourth Amendment if it comes within an exception to the warrant requirement. Id. (*citing* Brigham City v. Stuart, 547 U.S. 398, 402 (2006). One exception is where the "exigencies of the situation…make the needs of the law enforcement so compelling that the warrantless [entry] is objectively reasonable under the Fourth Amendment.'" Id. (*quoting* Mincey v. Arizona, 435 U.S. 385, 393-94 (1978). In order "to evoke the exigent circumstances exception, officers must have 'probable cause to believe that exigent circumstances exist." Id., at 803 (*quoting* Smith v. Page, 834 F.3d 1285, 1293 (11th Cir. 2016). The court in Lowe found that the officers "had probable cause to believe that [plaintiff] had committed a crime and that exigent circum-stances justified their entry into this home to make a warrantless arrest." Id.

Similarly, here, Hardaway and Johns were acting on information reported by the 911 caller who was hearing "bumping noises…and someone saying "stop.,. Please stop." Based on this information, Hardaway and Johns could reasonably have

believed or suspected that an individual was in physical danger. Their paramount concern remained at all times before entering the apartment, that an individual inside the apartment was at risk, and possibly in need of medical attention especially after a search of the parking revealed no woman in a car, as had been indicated by Wilks. These factors considered together clearly show the likelihood that exigent circumstances existed, requiring Hardaway and Johns to enter the apartment with force.

In <u>Lowe</u>, the court noted the "ambiguous circumstances [the officers] found at the scene had 'probable cause' to believe that 'exigent circumstances existed,' and that they needed to arrest [plaintiff] to remove him from the entryway to determine whether [the wife] was hurt inside the house.'" <u>Lowe</u>, *supra*, 804 (*quoting* <u>Smith v. Page</u>, 834 F.3d at 1293). As for the plaintiff in <u>Lowe</u> chiding the officers telling them that they "should have asked the dispatcher to call [his wife] to check whether she was all right," the court rejected this argument explained that "doing so would defeat the purpose of the 911 system: '[i]f law enforcement could not rely on information conveyed…by 911 callers, their ability to respond effectively to emergency situations would be significantly curtailed.'" <u>Id.</u> (*quoting* <u>United States v. Holloway</u>, 290 F.3d 1331, 1337 (11th Cir. 2002).

Thus, the circumstances as known to Defendants Hardaway and Johns at the time were sufficient to show that exigent circumstances existed, and warranted their

forceful entry into the apartment, and the arrest of Plaintiff.

**II.     Defendants Hardaway and Johns are entitled to immunity from Plaintiff's state law claims of battery, false arrest, and wrongful death.**

Section 768.28(9)(a), Fla. Stat., states in pertinent part that,

> An officer, employee, or agent of the state or any of its subdivisions may not be held personally liable in tort or named as a party defendant in any action for any injury or damage suffered as a result of any act, event, or omission of action in the scope of her or his employment or function, unless such officer, employee, or agent acted in bad faith or with malicious purpose or in a manner exhibiting wanton and willful disregard of human rights, safety, or property.

There is no dispute that Hardaway and Johns were acting at all times in their capacity as employees of the City of Crestview, and they are entitled to immunity unless their actions are deemed to have been "in bad faith or with malicious purpose or in a manner…"

The qualified immunity provided to public officials of the State of Florida is an "'immunity from suit rather than a mere defense to liability.'" <u>Tucker v. Resha</u>, 648 So. 2d 1187, 1189 (Fla. 1994) (*quoting* <u>Mitchell v. Forsyth</u>, 472 U.S. 511, 526, 105 S. Ct. 2806, 86 L.Ed.2d 411 (1985). In <u>Keck v. Eminisor</u>, 104 So.2d 359 (Fla. 2012), recognized that section 768.28(9)(a) protects public officials from "even being named as a defendant." <u>Id.</u>, at 366. In <u>Tucker v. Resha</u>, the Court explained that what is at stake with respect to a public official's entitlement to qualified

immunity, is that once "lost [it] cannot be restored on appeal if one is erroneously required to litigate." Id., at 648 So.2d at 1189; see Keck v. Eminisor, *supra*, at 364-65 ("immunity from suit 'is effectively lost if a case is erroneously permitted to go to trial . . .'").

Section 768.28(9), Fla. Stat. does not define "bad faith" however the phrase has been equated with the actual malice standard." Turner v. Phillips, 547 F. Supp. 3d 1188, (N.D. Fla. 2021) (*quoting* Parker v. Fla. Bd. of Regents ex rel. Fla. State Univ., 724 So.2d 163, 167 (Fla. 1st DCA 1998) (other citation omitted); see Peterson v. Pollack, 290 So.3d 102, 109 (4th DCA 2020). Likewise, "'malicious purpose' has been construed to mean 'ill will, bad or evil motive, or such gross indifference to or reckless disregard of the rights of others as will amount to a willful and wanton act." Turner v. Phillips, *supra* (*quoting* Bothmann v. Harrington, 458 So.2d 1163, 1171 n. 11 (Fla. 3d DCA 1984) (other citation omitted); see Ross v. City of Jacksonville, 274 So.3d 1180, 1183 (Fla. 1st DCA 2019)(to pierce the immunity provided in section 768.28, Fla. Stat., a plaintiff must show that government actors acted "in a manner exhibiting wanton and willful disregard of human rights, safety, or property.").

### a.    Count IV - Battery

Count IV raises a state-law battery claim against Officers Hardaway, Johns, Reynolds, and the City of Crestview. See Complaint, ¶¶ 72-80.

Under Florida law, "[a] battery claim for excessive force is analyzed by focusing upon whether the amount of force used was reasonable under the circumstances." City of Miami v. Sanders, 672 So. 3d 46, 47 (Fla. 3d DCA 1996). Also under Florida law, "police officers are entitled to a presumption of good faith in regard to the use of force applied during a lawful arrest, and officers are only liable for damage where the force used is 'clearly excessive.'" Id. In addition, "[t]he question of whether the force used by the officer in the course of an arrest is excessive is a 'pure question of law,' decided by the court." Grund v. Aden, 2022 WL 193689239 (N.D. Fla. 2022) (quoting Stephens v. DeGiovanini, 852 F.3d 1298, 1321 (11th Cir. 2017).

In Gualtieri v. Bogle, 343 So.3d 1267 (Fla. 2d DCA 2022), the plaintiff alleged a state-law battery claim against a sheriff's deputy. The title of the cause of action was "Count I – State Law Battery (Without Bad Faith or Willful, and Wanton Disregard). Id. at 1272. The court held, due to failing to allege that the deputy act3ed with bad faith, malicious purpose, or willful and wanton disregard toward the plaintiff at the time of the alleged battery, that the state-law battery claim was not viable. Id.

Here, Plaintiff's Complaint specifically states that Defendants Hardaway and Johns' conduct "was intentional, but was not willful, wanton or malicious." See Complaint, ¶ 74. Conveniently, Plaintiff pleads in the alternative that the officers'

conduct was "intentional, malicious, wanton and willful..." Id., at ¶ 79.

Additionally, the body-worn camera evidence[2] does not show that Hardaway or Johns acted with the requisite bad faith, malicious purpose, or willful and wanton disregard so as to exclude them from immunity from personal liability under section 768.28(9)(a), Fla. Stat. Id., at 1272. Hardaway and Johns adopt the body-worn camera evidence outlined above regarding their actions with regard to Wilks.

To impose liability on Hardaway and Johns, this Court must find that the force used was more than gross negligence to violate section 768.28(9)(a), as this statute grants immunity to a state employee who merely act with gross negligence and not the greater degree of culpability set forth in the statute. Ross v. City of Jacksonville, 274 So.3d at 1182.

The fact that Wilks died approximately 24 hours later does not, as a matter of law, make the force used by them excessive, including the use of drive-stun. From Hardaway and Johns' perspective, they were dealing with a strong, agitated, and hostile person who fought them with violence. They ordered him to get on the ground/couch which he refused to do, and then began fighting with them aggressively to keep them from handcuffing him.

Importantly, the bodycam shows that Hardaway exercised great patience with

---

[2] Wilks' intentional slamming the door on Hardaway's constituted a battery on a law enforcement officer. See section 784.07, Fla. Stat. ("Assault or battery of law enforcement officers…").

Wilks when over the course of several minutes told him repeatedly that he simply wanted Wilks to come out of the apartment and talk. As above, Wilks chose to slam the door against Hardaway's foot with increasing ferocity; and when Hardaway and Johns forcibly entered the apartment, they did not strike or hit him, but simply told him to sit on the couch which he refused to do—instead, choosing to violently resist the officers.

Section 768.28(9)(a), Fla. Stat., provides immunity to individual government employees acting in the course and scope of their duties unless they "acted in bad faith or with malicious purpose or in a manner exhibiting wanton and willful disregard for human rights, safety, or property." To impose liability on a governmental employee, section 768.28(9), Florida Statutes, requires a showing of "actual malice" on the part of a public official, and whose alleged actions "must be conduct much more reprehensible and unacceptable than a mere intentional tort." Duyser by Duyser v. School Bd. of Broward Cty., 573 So.2d 130, 131 (Fla. 4th DCA 1991)(per curiam).

The court in Peterson v. Pollack, 290 So.3d 102 (Fla. 4th DCA 2019) analyzed the phrases "bad faith," "malicious purpose," and "wanton and willful disregard for human rights or safety," and concluded that they require facts showing "actual malice," "ill will, hatred, spite, [or] an evil intent," and "conduct much more reprehensible and unacceptable than mere intentional conduct." Id., at 109.

The facts in this case, and specifically the bodycam evidence, show that Hardaway and Johns did not act in "bad faith," or with "malicious purpose," or with wanton and willful disregard for human rights and safety," or "actual malice," or "ill will, hatred, spite, or evil intent.

Plaintiff's state-law battery claim fails for the same reasoning his excessive force federal claim fails as well as for the argument above.

### b.    Count V – False Arrest

Florida state law is essentially the same as federal law on false arrest claims under the Fourth Amendment, and Hardaway and Johns adopt and incorporate the legal arguments made on the federal claim of false arrest.

The existence of probable cause "operates to a bar a state law claim for false arrest." <u>Fernander v. Bonis</u>, 947 So.2d 584, 589 (Fla. 4th DCA 2007). The bodycam evidence clearly establishes that Hardaway and Johns had probable cause to arrest Wilks based on his continued refusal to obey Hardaway's lawful command to come out the apartment, and his continued slamming the door on Hardaway's foot which constitutes a battery on a law enforcement officer.

The undisputed facts clearly demonstrate that Hardaway and Johns had ample and substantial grounds to arrest Wilks, and Plaintiff's state law claim of false arrest should be dismissed accordingly.

### c. Count VIII – Wrongful Death

Plaintiff alleges that Hardaway and Johns engaged in "intentional conduct; or in the alternative, intentional and malicious, wanton and reckless conduct…," or alternative[ly]…negative actions and omissions…,"which caused Wilks' death. See Complaint, ¶¶ 120-130.

As with Plaintiff's excessive force claims against Hardaway and Johns, to impose personal liability on a wrongful death claim requires showing that their actions show bad faith, intentional, willful, wanton, or with malicious purpose. See Lemay v. Kondrk, 923 So.2d 1188, 1190-91 (Fla. 5th DCA 2006).

Again, the actions taken by Hardaway and Johns fall far short of the conduct necessary to impose personal liability on them. Hardaway and Johns implored Wilks repeatedly to come out of the apartment and talk to them and Wilks rejected these requests and continued slamming the door against Hardaway's foot with escalating force. Similarly with respect to entering the apartment with force, they told Wilks to get on the couch, and rather than comply he chose to resist Hardaway and Johns with violence—essentially fighting with the officers to keep them from handcuffing him.

Therefore, Plaintiff's state law claims against Hardaway and Johns should be dismissed based on the undisputed facts and application of law regarding the claims of battery, false arrest, and wrongful death.

WHEREFORE, this Court should grant Hardaway and Johns' Motion to Dismiss based on the undisputed facts in this action as well as established by the information supplied by the body-worn camera footage and 911 call.

## CERTIFICATE OF WORD COUNT

In accordance with United States District Court for the Northern District of Florida, Local Rules 7.1(F) and 56.1(B), Defendants Hardaway and Johns, certify that this Motion to Dismiss and accompanying memorandum of law contains 6,704 words.

**DENNIS, JACKSON, MARTIN
& FONTELA, P.A.**

CRAIG DENNIS, ESQ. (FBN: 0361836)
craig@djmf-law.com
JESSICA E. KEELER, ESQ. (FBN: 1015660)
jkeeler@djmf-law.com
1591 Summit Lake Drive, Suite 200
Tallahassee, Florida 32317
Office; (850) 422-3345
Facsimile: (850) 422-1325

*Attorneys for Defendants Hardaway and Johns*

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that a true and correct copy of the foregoing has been furnished via the Court's CM/ECF system on this 8th day of August, 2023, to all counsel of record.

**DENNIS, JACKSON, MARTIN**
**& FONTELA, P.A.**

CRAIG DENNIS, ESQ. (FBN: 0361836)
craig@djmf-law.com
JESSICA E. KEELER, ESQ. (FBN: 1015660)
jkeeler@djmf-law.com
1591 Summit Lake Drive, Suite 200
Tallahassee, Florida 32317
Office; (850) 422-3345
Facsimile: (850) 422-1325

*Attorneys for Defendants Hardaway and Johns*