**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF FLORIDA**
**PENSACOLA DIVISION**

BART FLEET, as Personal Representative
of the Estate of CALVIN WILKS, JR.,
deceased,

              Plaintiff,

v.                          Case No.:  3:23-cv-09214-MCR-HTC


BRANDON HARDAWAY, in his
individual and official capacities, as
City of Crestview's Police Officer;
WILLIAM JOHNS, II, in his
individual and official capacities, as
City of Crestview's Police Officer;
EVAN REYNOLDS, in his
individual and official capacities, as
City of Crestview's Police Officer;
and STEPHEN MCCOSKER, in his
individual, supervisory capacity,
and as City of Crestview's Chief of
Police; and THE CITY OF
CRESTVIEW, FLORIDA, a
political subdivision of the state of
Florida,

              Defendants.
_____/


**<u>PLAINTIFF'S RESPONSE IN OPPOSITION TO DEFENDANTS'</u>**
**<u>BRANDON HARDAWAY AND WILLIAM JOHNS, II MOTION TO</u>**
**<u>DISMISS COUNTS I, II, III, IV, V, AND VIII OF PLAINTIFF'S</u>**
**<u>COMPLAINT</u>**

Plaintiff, BART FLEET, as Personal Representative of the Estate of CALVIN WILKS, JR., deceased, (hereinafter, "Plaintiff"), by and through the undersigned attorney, hereby responds to Defendants' BRANDON HARDAWAY (hereinafter, "Hardaway") and WILLIAM JOHNS, II's (hereinafter, "Johns") (collectively "Defendants'") Motion to Dismiss COUNTS I, II, III, IV, V, and VIII of Plaintiff's Complaint ("Motion") and respectfully requests that this Honorable Court deny Defendant's Motion. In support of the foregoing, Plaintiff avers as follows:

## BACKGROUND

1.     On May 2, 2023, Plaintiff filed an eight-count Complaint asserting claims against the City of Crestview, three City of Crestview officers in their individual capacity, and City of Crestview Chief of Police McCosker in both his individual (supervisory) and official capacities. [ECF. 1] ("Complaint").

2.     The genesis of the Complaint is an incident that occurred on October 14, 2021, between three City of Crestview police officers (BRANDON HARDAWAY, WILLIAM JOHNS, II, and EVAN REYNOLDS) (hereinafter, the "Individual Defendants") and Calvin Wilks Jr. (deceased) ("Plaintiff's Decedent"). Per the Complaint, "Calvin Wilks, Jr. continuously tried to slam the door shut, but was

continually prevented from doing so due to the placement of Hardaway's foot in the door frame. Hardaway informed Calvin Wilks, Jr. until he was able to determine no criminal activity occurred he would not be moving his foot from the doorway." (Complaint, ¶ 32). "Calvin Wilks, Jr., holding his cell phone, threatened to call the Sheriff if Hardaway would not remove his foot from the door frame." (Complaint, ¶ 33). "At this point, the Defendants, specifically including, but not limited to Hardaway, made a decision to enter Calvin Wilks, Jr.'s residence and detain him." (Complaint, ¶ 34). "Hardaway, Johns, and Reynold's entered the residence." (Complaint, ¶ 36). "At this point, Hardaway and Johns began placing Calvin Wilks, Jr. in mechanical (both wrist and ankle) restraints on the floor in a prone position." (Complaint, ¶ 41). "At this point, Johns, using his department-issued taser, conducted approximately five (5) "dry" or "drive" stuns to Mr. Wilks, to areas including Calvin Wilks, Jr.'s lower back area, his left buttocks area and his groin area. Johns sadistically shocked Calvin Wilks, Jr., delivering approximately 50,000 volts of electricity five times with sustained shocks from the taser, causing Calvin Wilks, Jr.'s body to painfully convulse." (Complaint, ¶ 42). "While on scene, Calvin Wilks, Jr. stopped breathing and CPR was administered by EMS and Fire. Calvin Wilks, Jr. was transported to North Okaloosa Medical Center, where he was pronounced dead the

3

following day..." (Complaint, ¶ 45).[1]

3.     On  08/08/2023,  Defendants Hardaway and Johns filed their Motion to Dismiss [ECF 35] ("Motion").

4.     The Counts made at-issue by Defendants' Motion are as follows:

a.     Count I - Civil Rights Violations under 42 U.S.C. § 1983 Individual Capacity Unlawful Arrest Claim (against Defendants Hardaway and Johns only);

b.     Count II - Civil Rights Violations under 42 U.S.C. § 1983 Individual Capacity Excessive Force Claim (against Defendant Hardaway only);

c.     Count III  Civil Rights Violations under 42 U.S.C. § 1983 Individual Capacity Excessive Force Claim (against Defendant Johns only);

d.     Count IV - Florida state law claim of battery (against Defendants Hardaway and Johns only);

e.     Count V - Florida state law claim of false arrest (against Defendants Hardaway and Johns only); and

f.     Count VIII - Florida state law claim for Wrongful Death (against Defendants Hardaway and Johns only).

---

[1]  (For ease of reference, a copy of Plaintiff's Complaint is attached hereto as "Exhibit A,"  without the exhibits previously filed with the Court at case initiation).

## MEMORANDUM OF LAW

## I.    LEGAL AUTHORITY

"A pleading that states a claim for relief must contain...a short and plain statement of the claim showing that the pleader is entitled to relief." FED. R. CIV. P. 8(a)(2). When ruling on a motion to dismiss, a court must view the complaint in the light most favorable to the plaintiff and accept the plaintiff's well-pleaded facts as true. *See, St. Joseph's Hosp., Inc. v. Hosp. Corp. of Am.*, 795 F.2d 948, 953 (11th Cir. 1986). In deciding a motion to dismiss, the court "should examine only the four corners of the complaint" and "must accept a plaintiff's well pled facts as true and construe the complaint in the light most favorable to the plaintiff." *Lamar Advertising of Mobile, Inc. v. City of Lakeland*, 980 F. Supp 1455 (M.D. Fla. 1997) (citing *Hishon v .King & Spalding*, 467 U.S. 69, 73 (1984); *Schuer v. Rhodes*, 416 U.S. 232 (1974); *Howry v. Nisus, Inc.*, 910 F. Supp. 576 (M.D. Fla. 1995); *Rickman v. Precisionaire, Inc.*, 902 F. Supp. 232 (M.D. Fla. 1995).

In order to succeed in moving to dismiss a claim under the federal rules, the moving party must show that "there is no possibility that the plaintiff can recover under the allegations of his complaint." *Madison v. Purd*, 410 F.2d 99 (5th Cir. 1969). This is not an easy showing to make because the Federal Rules of Civil Procedure

require a plaintiff to provide a short and plain statement of the party's assertions sufficient to put the opposing party on notice of the claims against it. Fed. R. Civ. P. 8; *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (stating Federal Rules of Civil Procedure do not require detailed factual allegations, merely allegations sufficient to raise a right to relief above the speculative level); *Swierkiewicz v. Sorema N.A.*, 534 U.S. 506, 508 (2002).

The holding in *Twombly* applies to all civil actions. *Ashcroft v. Iqbal*, 129 S.Ct. 1937 (2009). In *Iqbal*, the Court applied a two prong approach: determine what factual allegations are entitled to a presumption of veracity, and then assess whether these facts give rise to an entitlement for relief. *Id.*, at 1950. In determining whether factual allegations are entitled to the assumption of truth, the Court stated that it was not whether the facts are "unrealistic or nonsensical" or even "extravagantly fanciful," rather it is their conclusory nature that "disentitles them to the presumption of truth." *Id.*, at 1951.

A complaint must state a plausible claim for relief, and "[a] claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.*, at 1949. A motion to dismiss should not be granted when "the plaintiff pleads factual

content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Halpin v. David*, No. 4:06CV457-RH/WCS, 2009 WL 2960936, at *2 (N.D. Fla. Sept. 10, 2009) (citing *Iqbal*,129 S.Ct. at 1949).

## II.   ARGUMENT

### A.   It Would Be Improper to Consider Body Camera Footage in this Motion to Dismiss Context

The Eleventh Circuit has recently concluded that video footage may properly be considered on a motion to dismiss under the incorporation-by-reference doctrine. *Thompson v. City of St. Cloud*, 2023 WL 3931952, at *1 (M.D. Fla. June 9, 2023) (citing *Baker v. City of Madison, Alabama*, 67 F.4th 1268 (11th Cir. 2023)).

In *Baker*, the Eleventh Circuit explained:

> "Under the incorporation-by-reference doctrine, a court may consider evidence attached to a motion to dismiss without converting the motion into one for summary judgment if (1) "the plaintiff refers to certain documents in the complaint," (2) those documents are "central to the plaintiff's claim," and (3) the documents' contents are undisputed.[2] Evidence is "undisputed" in this context if its authenticity is unchallenged."[3]

*City of St. Cloud*, 2023 WL 3931952, at *1 (citing *Baker*, 67 F.4th at 1268

---

[2] *City of St. Cloud*, 2023 WL 3931952, at *1 (citing *Baker*, 67 F.4th at 1268 (citation omitted); (citing *Horsley v. Feldt*, 304 F.3d 1125, 1134 (11th Cir. 2002); *Brooks v. Blue Cross & Blue Shield of Fla.*, Inc., 116 F.3d 1364, 1369 (11th Cir. 1997)  (citation omitted).

[3] *City of St. Cloud*, 2023 WL 3931952, at *1 (citing *Baker*, 67 F.4th at 1268 (citation omitted); (citing *Horsley*, 304 F.3d at 1134)) (citation omitted).

(citation omitted).

### a)    Plaintiff did not reference body camera footage in the Complaint

As the Eleventh Circuit recently stated with regard to documents incorporated-by-reference in a motion to dismiss, *"the plaintiff refers to certain documents in the complaint." Baker*, 67 F.4th at 1276 (emphasis added). As acknowledged by Defendants in their Motion, "Here, although the body-worn camera videos are not specifically referenced..." (Motion, at p. 4). Thus, *Baker* has no bearing on the present matter for this reason alone, and the analysis ends there.[4]

### b)    The facts attendant to *Baker* are easily distinguishable from those present in the instant matter

Notwithstanding, looking at *Baker* itself, Baker involved a *pro se* complaint. *Baker*, 67 F.4th at 1272. As to the Complaint itself, the trial court (the Northern District of Alabama) outlined the *Baker* plaintiff's allegations, as follows:

> "Baker alleges the following in his Complaint. He's a Black man and an epileptic. Law enforcement and emergency medical personnel in the Madison area know him and know about his condition. (Doc. 1 at 1). He had a car accident after suffering an epileptic seizure on March 16, 2019. *Id.* Paramedics arrived on the scene shortly after the accident occurred. Baker's friend told paramedics that Baker had suffered a

---

[4] *Cf. Baker*, 67 F.4th at 1277 ("First, Baker referenced the body camera footage in his complaint several times. At one point, the complaint even alleged that "[u]pon information and belief, it is averred that the video recording is a display of what happened.").

seizure and that he was still in the throes of that seizure. (Doc. 1 at 1, 2, 3). Officer Daniel Nunez arrived shortly after the paramedics. Those paramedics told Nunez that Baker couldn't understand him. (Doc. 1 at 5). Baker's friend advised Nunez and Officer Dion Hose that Baker was having a seizure. (Doc. 1 at 4). Nunez tried to force Baker onto a stretcher paramedics provided. (Doc. 1 at 2). When Baker refused, instead opting to call his mom, Nunez tased him "multiple times." (Doc. 1 at 2). Baker later received a letter from the City of Madison, advising him that the actions taken against him were consistent with municipal policy. (Doc. 1 at 6)."

*Baker v. City of Madison, Alabama*, 2022 WL 390896, at *1 (N.D. Ala. Feb.

8, 2022), *aff'd*, 67 F.4th 1268 (11th Cir. 2023).

As to the body camera footage made at-issue in *Baker*, upon review of the

footage, the Eleventh Circuit writes, in pertinent part:

"Baker again headed toward the open driver's door of his vehicle to get in the vehicle. Officer Nunez again grabbed Baker's arm, telling him "no." Baker pulled his arm away and said he was trying to "get in [his] motherfucking car" and told Officer Nunez to "move."

Officer Nunez tried to stop Baker from getting back in his vehicle, grabbing his arm. But Baker, becoming more agitated, broke free again and told Officer Nunez to "chill" and "get the fuck off [him]." Baker moved toward Officer Nunez, stating that Officer Nunez would "be in jail somewhere for fucking with [him]."

At this time, Officer Nunez backed away, drew his taser, and pointed it at Baker (but Officer Nunez did not fire it). Officer Nunez told Baker to "chill" and to "step back." Officer Nunez held his left hand out toward Baker, who pushed it away. Officer Nunez reported on his radio that "the suspect was being combative."

Next, Baker (1) turned away from Officer Nunez, (2) walked again toward the open driver's door, (3) pushed past one paramedic who tried to stop him, and (4) sat down sideways in the driver's seat with his feet still on the road. Officer Nunez put his taser back in the holster, grabbed Baker's left arm, and attempted to remove Baker from the vehicle by pulling on Baker's left arm. Baker called Officer Nunez a "bitch" and resisted being removed from the vehicle. As Baker came out of the vehicle, he reached for Officer Nunez and moved toward him.

Officer Nunez then stepped back, drew his taser again, and fired the taser, hitting Baker in the stomach. Officer Nunez's body camera footage shows that from approximately 12:06:36 to 12:06:48, Baker (1) fought the taser's charge, (2) moved back toward the driver's seat of his vehicle, (3) pulled off his sweatshirt, and (4) told Officer Nunez to "chill out." Officer Nunez removed his taser's cartridge, loaded a new one, and again pointed the taser at Baker. When Officer Nunez threatened to deploy the taser again, Baker said, "Damn, that shit hurt my boy."

After firing his taser the one time, Officer Nunez told Baker at least sixteen times to turn around. Baker repeatedly did not turn around, continued to resist Officer Nunez's commands, and once again tried to get in his vehicle.

More than two minutes after Officer Nunez had tased Baker, Officer Hose arrived on the scene. When Officer Hose approached Baker, Baker said, "Hey, Mr. Officer. Can y'all get this man? He just shot me in my stomach."

Officer Hose engaged Baker (who was still resisting Officer Nunez) and, with help from a third officer, subdued Baker and placed him in handcuffs."

*Baker*, 67 F.4th at 1273–74.

The allegations set forth by the *Baker* plaintiff in his complaint, lacking in

detail, is not entirely unexpected for a *pro se* plaintiff. *See, Baker*, 2022 WL 390896, at *1. The allegations lack context and background when compared to those which the Eleventh Circuit detailed in its opinion based off of its review of the body camera footage. *See, Baker*, 67 F.4th at 1273–74. Most notably, upon review of the footage and upon comparison with the allegations present in the *Baker* plaintiff's complaint, the Eleventh Circuit states: "the footage plainly contradicts Baker's alleged version of events, leading us to view most of the facts as depicted by the video." *Id.*, at 1278. Here, that is not the case. Plaintiff's allegations are consistent with the body camera footage as Defendants reference in their Motion and supplied to the Court. As such, this is not an instance where "the footage plainly contradicts [the plaintiff's] alleged version of events." *Id.*, at 1278.

### B. Defendant Hardaway and Defendant Johns Violated Plaintiff's Decedent's Constitutional Rights when each Participated in the Seizure of Plaintiff's Decedent without Arguable Reasonable Suspicion of Criminal Activity

### a. The Three Types of Contacts Between Law Enforcement Officers and Citizens

It is generally recognized under constitutional law that there are three types of contacts between law enforcement officers and citizens: (1) citizen contact, (2) investigative detention and (3) arrest. During the first type of contact, a citizen

contact, no seizure of the citizen occurs. The citizen is free to choose whether he wants to speak to or follow the instructions of the officer initiating the contact. He may ignore the officer or walk away from him if he so chooses. Because this is a consensual encounter, constitutional safeguards are not invoked. *See United States v. Mendenhall*, 446 U.S. 544, 553-555 (1980).

During the second type of contact, an investigative detention, the officer seizes the citizen either through words or actions which a reasonable person would construe as a restriction on his freedom to end the encounter and leave. Because a seizure takes place, however temporary it may be, Constitutional protections under the Fourth Amendment are implicated. The officer involved can only initiate an investigative detention if he has reasonable suspicion that the person has committed, is committing, or is about to commit a crime or if the officer has a reasonable suspicion that the individual detained is armed and dangerous. *See Terry v. Ohio*, 392 U.S. 1, 23-28 (1968). "Reasonable suspicion" is not satisfied by "an inchoate and unparticularized suspicion or hunch of criminal activity." *United States v. Yuknavich*, 419 F.3d 1302, 1311 (11th Cir. 2005). Rather, the officer must "be able to point to specific and articulable facts which, taken together with rational inferences from those facts, reasonably warrant that intrusion." *Terry*, 392 U.S. at 21. "And simple 'good faith on

the part of the arresting officer is not enough.' If subjective good faith alone were the

test, the protections of the Fourth Amendment would evaporate, and the people would

be 'secure in their persons, houses, papers and effects,' only in the discretion of the

police." *Id.,* at 22.

The third type of contact, arrest, must be supported by probable cause. *See*

*Michigan v. Summers*, 452 U.S. 692, 700 (1981). Probable cause is "defined in terms

of facts and circumstances 'sufficient to warrant a prudent man in believing that the

(suspect) had committed or was committing an offense.'" *Gerstein v. Pugh*, 420 U.S.

103, 111 (1975).

### C. Defendant Hardaway's and Defendant Johns' Investigative Detention of Plaintiff's Decedent was Unlawful as it was Conducted Without Reasonable Suspicion of Criminal Activity or that Plaintiff's Decedent was Armed and Dangerous

### a. Defendant Hardaway's and Defendant Johns' Unlawful Seizure of Plaintiff's Decedent

Plaintiff's Decedent attempted to end the interaction with the Individual

Defendants, including Defendants Hardaway, as alleged, to wit:

> "22.   After the passage of a few minutes, Calvin Wilks, Jr. returned to the front door and opened the front door, where he again encountered Hardaway in the doorway, and stated "I ain't got nothing sir, for real, I ain't got nothing," and began to close the front door.
>
> 23.   Hardaway put his hand against the door and advised Calvin

Wilks, Jr. to "hold on." Calvin Wilks, Jr. began to push on the door, attempting to close the door, advising Hardaway "you are not coming into my house".

24.    Hardaway placed his left foot inside the door frame to prevent Calvin Wilks, Jr. from being able to secure the door closed.

25.    Calvin Wilks, Jr. began to repeatedly and over the course of a couple of minutes attempt to close the door, but was unable to do so due to the placement of Hardaway's foot inside of the door frame.

26.    Calvin Wilks, Jr. repeatedly told Hardaway to "move his foot."

27.    Calvin Wilks, Jr. told Hardaway  "you cannot come in this house."

28.    Calvin Wilks, Jr. told Hardaway to "get out of this house."

29.    Hardaway told Calvin Wilks, Jr. that neither he or his fellow officers would come into his residence.

30.    Hardaway asked Calvin Wilks, Jr. if he wanted Hardaway to leave, to which Calvin Wilks, Jr. replied "yes."

31.    At which time, Hardaway informed Calvin Wilks, Jr. that if he wanted Hardaway to go away then he needed to talk to him. Calvin Wilks, Jr. stated at that time that she, later determined to be Amber Robertson, is right down there (pointing to the parking lot). Calvin Wilks, Jr. advised Amber was in a gray car in the parking lot and not in his residence.

32.    Calvin Wilks, Jr. continuously tried to slam the door shut, but was continually prevented from doing so due to the placement of Hardaway's foot in the door frame. Hardaway informed Calvin Wilks, Jr. until he was able to determine no criminal activity occurred he would not be moving his foot from the doorway.

14

34.     At this point, the Defendants, specifically including, but not limited to Hardaway, made a decision to enter Calvin Wilks, Jr.'s residence and detain him."

(Complaint, at ¶¶ 22-31, 32, 34)

As stated in the preceding section, an officer can initiate an investigative detention only if he has reasonable suspicion that the person being detained has committed, is committing, or is about to commit a crime or if the officer has a reasonable suspicion that the individual detained is armed and dangerous. *See Terry v. Ohio*, 392 U.S. 1, 23-28 (1968). "Reasonable suspicion" is not satisfied by "an inchoate and unparticularized suspicion or hunch of criminal activity." *United States v. Yuknavich*, 419 F.3d 1302, 1311 (11th Cir. 2005). Rather, the officer must "be able to point to specific and articulable facts which, taken together with rational inferences from those facts, reasonably warrant that intrusion." *Terry*, 392 U.S. at 21.

In *McNally v. Eve*, 2008 WL 1931317 (M.D. Fla. May 2, 2008), the police were called to investigate a noise violation at a house party, finding the host wearing only a bathing suit. *Id.*, at *1. The host refused the police entrance without a warrant and attempted to turn away when threatened with arrest. The host was then tasered, brought to the ground, and arrested for obstruction of justice. *Id.* The Middle District found that violating the noise ordinance—and even the alleged crime of

obstruction—was of minor severity; that the host, speaking calmly and clearly unarmed, posed no threat to the officer nor anyone else; and, that the host never resisted arrest, nor attempted to flee (even by turning away). *Id.*, at \*8. In such circumstances, the Middle District held that the evidence was sufficient to find the officer's conduct objectively unreasonable under the circumstances, thus, the conduct was excessive and in violation of the Fourth Amendment.[5]

Under the circumstances, there was absolutely no basis for any of the Individual Defendants, including either of these Defendants, to enter Plaintiff's Decedent's residence or seize Plaintiff's Decedent, such that any degree of force whatsoever was unconstitutional. Accordingly, the Individual Defendants, including both Defendant Hardaway and Defendant Johns, violated Plaintiff's Decedent's right to be free from unlawful seizure under the Fourth Amendment, and the entire detention and arrest by the Individual Defendants, including both these Defendants, that followed, was unlawful.

**b.   Defendant Johns is Liable for any Force he Used Against Plaintiff's Decedent Incidental to the Unlawful Seizure**

---

[5]  *Id.*, at \*8; *see also, Walters v. Freeman*, 572 F. App'x 723, 726 (11th Cir. 2014); *Washington v. Tobeck*, 432 F. App'x 900, 901 (11th Cir. 2011) ("Application of the exigent-circumstances exception in the context of a home entry should rarely be sanctioned when there is probable cause to believe that only a minor offense has been committed.").

In evaluating the force used by the officer in *Baker*, based on the totality of the circumstances, an officer's *single use* of a taser in dart-mode, the Eleventh Circuit stated as follows:

> "Officer Nunez's use of the taser was justified because of (1) Baker's repeated failure to comply with Officer Nunez's commands, (2) Baker's unsafe driving that had just caused an automobile accident, (3) Baker's repeated efforts to get back in the vehicle, (4) Baker's physical resistance to Officer Nunez's attempts to remove him from the vehicle, and (5) the tense, uncertain, and rapidly evolving series of events. What started as a routine incident response escalated. Officer Nunez "was not required to wait and hope for the best" before making the split-second decision to tase Baker."

*Baker*, 67 F.4th at 1280–81 (emphasis added) (citing *Jean-Baptiste v. Gutierrez*, 627 F.3d 816, 821 (11th Cir. 2010) (alteration adopted) (quotation marks omitted)).

Defendants attempt to draw a parallel between this matter and *Hinson v. Bias*, 927 F.3d 1103 (11th Cir. 2019), where "the plaintiff *stabbed an individual*, and police responded to the location finding plaintiff in the process of exiting from a parking garage." (Motion, p 13, citing *Hinson*, at 1109) (emphasis added). Here, there was no known or suspected violent crime of any such nature as in *Hinson* - much less a fleeing individual suspected of such a crime.

The Eleventh Circuit further analogized the situation present in *Baker* to "a

difficult, tense[,] and uncertain situation[,] the use of a taser gun to subdue a suspect who has repeatedly ignored police instructions and continues to act belligerently toward police is not excessive force." *Baker*, 67 F.4th at 1281 (citing *Zivojinovich v. Barner*, 525 F.3d 1059, 1073 (11th Cir. 2008)  (quotation marks omitted)). With respect to Defendant Johns, as Plaintiff has alleged:

> "38.   At this point, Calvin Wilks, Jr. was violently taken to the ground by the Defendants Hardaway and Johns. Further, Calvin Wilks, Jr.'s face was ground into floor, tearing his skin.
>
> 42.   At this point, Johns, using his department-issued taser, conducted approximately five (5) "dry" or "drive" stuns to Mr. Wilks, to areas including Calvin Wilks, Jr.'s lower back area, his left buttocks area and his groin area. Johns sadistically shocked Calvin Wilks, Jr., delivering approximately 50,000 volts of electricity five times with sustained shocks from the taser, causing Calvin Wilks, Jr.'s body to painfully convulse."

Complaint, at ¶¶ 38, 42.

Such a scenario stands in stark contrast to that present in the instant matter, as can be gleaned from Plaintiff's allegations, upon even an impermissible review of body camera footage filed with the Court by these Defendants (should the Court review the footage - a staunch departure from the typical "four corners of the complaint"-type analysis;[6] particularly where the body camera footage was not

---

[6] *See, e.g., Lamar Advertising of Mobile, Inc*, 980 F. Supp at 1455.

specifically referenced in Plaintiff's Complaint), which justifies the summary denial

of Defendants' Motion. (*See*, Complaint).

### c.  Defendant Hardaway's Personal Participation in the Unlawful Seizure Renders him Liable Under 42 U.S.C. §1983

As to the facts and circumstances surrounding the Individual Defendants'

conduct, including Defendant Hardaway's conduct, it is detailed in Plaintiff's

Complaint, to wit:

> "38.   At this point, Calvin Wilks, Jr. was violently taken to the ground by the Defendants Hardaway and Johns. Further, Calvin Wilks, Jr.'s face was ground into floor, tearing his skin.
>
> 41.   At this point, Hardaway and Johns began placing Calvin Wilks, Jr. in mechanical (both wrist and ankle) restraints on the floor in a prone position."

Complaint, at ¶¶ 38, 41.

In *Mack v. Town of Wallkill*, 253 F.Supp.2d 552, 560 (S.D.N.Y. 2003), the

Southern District of New York denied qualified immunity to an officer who

participated in an unlawful arrest because he personally saw no criminal act by the

plaintiff and failed to ask the primary arresting officer why the plaintiff was being

arrested:

> "[A] reasonable officer in Bruce's position (i.e., an officer who saw no crime being committed and had no information suggesting that plaintiff had committed a crime) could and should have cleared up any confusion

by asking plaintiff and Officer Kuhn what was going on. If there were any evidence that he made such an inquiry, then (depending on Kuhn's responses) Bruce might well be entitled to qualified immunity-even if Officer Kuhn lied or misled Bruce about why plaintiff was backing her car up. However, on the record before me, there is no evidence that Bruce asked for clarification, and all Kuhn said (to Mack, but within Bruce's hearing) was, "You hit the fucking car." Since, viewing the facts most favorably to plaintiff, Bruce hit Mack's car, not vice versa, no reasonable officer in Bruce's position could have relied on Kuhn's statement as a basis for deciding that there was probable cause to believe plaintiff had done anything to warrant either arrest or a search of her vehicle."

*Id.*, at 560.

It is well settled in the Eleventh Circuit that "an officer who is present at the scene and who fails to take reasonable steps to protect the victim of another officer's use of excessive force, can be held liable for his nonfeasance." *Swofford v. Eslinger*, 671 F. Supp. 2d 1289, 1307–08 (M.D. Fla. 2009), aff'd, 395 F. App'x 559 (11th Cir. 2010); (citing *Fundiller v. City of Cooper City*, 777 F.2d 1436, 1442 (11th Cir. 1985); *Trammell v. Thomason*, 335 Fed. Appx. 835, 843 (11th Cir. 2009)) (citations omitted); *see also, Grandstaff v. City of Borger, Tex.*, 767 F.2d 161, 168 (5th Cir.1985) (finding that, because the use of force was a joint operation, each participant could be liable despite the inability to decipher which defendant fired the shot that killed the plaintiff). "A police officer's duty to intervene when he witnesses the use of excessive force and has the ability to intervene was clearly established prior

20

to 2006." *Bailey v. City of Miami Beach*, 2011 WL 3703282, at *8, 2011 U.S. Dist. LEXIS 93974, at *26 (S.D.Fla. Aug. 23, 2011).

In the instant case, Defendant Hardaway not only initiated the unlawful entry, but joined in the unlawful seizure without question, as did officer Bruce in the *Mack* case. Here, Defendant Hardaway's conduct was even more egregious than that of officer Bruce in the *Mack* case in that Defendant Hardaway's conduct was pivotal to the interaction in the respect that he was gripping Plaintiff's Decedent as Plaintiff's Decedent was being tased repeatedly by Defendant Johns. Accordingly, Defendant Hardaway is not entitled to qualified immunity based on his self-imposed ignorance as to the basis for the Individual Defendants', including specifically Defendants Hardaway and Defendant Johns', unlawful detention, arrest, restraint and tasing of Plaintiff's Decedent.

In *Carin v. City of New York*, 1998 WL 60952, *3 (S.D.N.Y. 1998), an officer who had no physical participation in the plaintiff's unlawful arrest was nevertheless denied summary judgment on a §1983 claim because of his "participation in the arrest." The officer rode in the van with the plaintiff to the police station and verbally abused plaintiff along the way. *See, Id.* In the instant case, there is no question that Defendant Hardaway personally participated in the unlawful seizure of Plaintiff's

Decedent, making an even stronger case for denial of qualified immunity to Defendant Hardaway.

The liability of "participating" officers for unlawful acts of their colleagues is more fully documented in cases involving unlawful searches. In these instances, cases have universally held that if an officer's actions are "integral to the search," they are liable for the unlawful search even if they did not perform the search themselves. *See James ex rel. James v. Sadler*, 909 F.2d 834, 837-838 (5th Cir. 1990) (officers who did not participate in unlawful pat-down search of plaintiff, but maintained security perimeter while search took place were not entitled to qualified immunity); *Boyd v. Benton County*, 374 F.3d 773, 780 (5th Cir. 2004) (officers who stood guard while another officer threw a "flash-bang" grenade into apartment were "integral to the search" and would be liable if use of flash-bang under circumstances of case were found to be unconstitutional); *Jones v. Williams*, 297 F.3d 930, 936 (9th Cir. 2002) (noting that "integral participation" or "personal involvement" required for officer to be found liable for unlawful search); *Howell v. Polk*, 2006 WL 463192 (D.Ariz. 2006) ("an officer that did not enter an apartment, and only provided armed backup at the door during a search is integral to the search and therefore can be liable when the search is found to be unconstitutional.").

Defendant Hardaway personally participated in, and was integral to, the unlawful seizure and arrest of Plaintiff's Decedent. Therefore, he is just as liable as any of the other Individual Defendants for damages stemming from the unlawful seizure, use of force against, and arrest of Plaintiff's Decedent. He is entitled to neither qualified immunity nor dismissal of this claim, particularly at this early stage of the litigation.

### D. Neither Defendant Hardaway nor Defendant Johns is Entitled to Qualified Immunity

Neither of these Defendants is entitled to qualified immunity for the unlawful seizure of Plaintiff's Decedent, as both knowingly violated Plaintiff's Decedent's clearly established constitutional right to be free from unlawful seizure. "A court evaluating a claim of qualified immunity must first determine whether the plaintiff has alleged the deprivation of an actual constitutional right at all, and if so, proceed to determine whether that right was clearly established at the time of the alleged violation." *Brent v. Ashley*, 247 F.3d 1294, 1299 (11th Cir. 2001). In support of their position, Defendants cite to *Flowers v. City of Melbourne*, 557 Fed. Appx. 893 (11th Cir. 2014) (Motion, p. 16). The blurb provided by Defendants in their Motion gives the Court all it needs to know to easily distinguish *Flowers* from the present matter, to wit: "the police were faced with a person who had disobeyed three orders to stop

approaching an officer who then kicked him." (Motion, p. 16). From this parenthetical it is easy to see that *Flowers* dealt with a situation involving a compelling concern for officer safety - an individual charging at officers. The facts of the instant matter do not even begin to approach such a scenario. Thus*, Flowers* has no bearing on this case and Defendants' reliance thereon is misplaced.

As to these Individual Defendants' entry into Plaintiff's Decedent's residence, Defendants cite to *Pena v. Marcus, et al.*, 715 Fed. Appx. 981 (11th Cir. 2017) (Motion, p. 18).  In *Pena,* the officers involved were executing a search warrant at a home following:

> "a tip concerning narcotics and gang activity at 945 Vista Palm Way, which was owned by sixty-seven year old Pena. The deputies conducted a "trash pull" at the house and found a residue that tested presumptively positive for cannabis. They also observed Daniel Santiago, Pena's grandson and a suspected CRIPS gang member, enter the home. When Pena invited deputies into the house, they saw mail, covered in gang symbols, addressed to Santiago."

*Pena*, 715 F. App'x at 983.

Notably, in *Pena*, "[a] state court judge issued a warrant to search the home for drugs and firearms. The parties agree that the warrant is facially valid." *Id.* Thus Defendants' attempt to draw a parallel between the circumstances attendant to *Pena* and the present matter is wholly without merit.

Defendants also cite to *Lowe v. Smith*, 759 Fed. Appx. 797 (11th Cir. 2018).
(Motion, p. 18). The facts in *Lowe* are not at all comparable to those here. In *Lowe*,
decided in summary judgment context, the defendant officers "received a 911 call
from this location" - meaning *from* inside the actual physical location they were
investigating. *Lowe*, 759 F. App'x at 800. "The Lowes' ten-year-old son N.L. called
911." *Id.* Moreover, "through the doorway, Officer Smith was able to see N.L." (the
minor child who called 911). *Id.* Thus, the officer responding visualized that the
minor child complainant was inside the household. Here, no other individual besides
Plaintiff's Decedent was ever observed nor found in the residence. Thus, *Lowe* is
quite dissimilar such that it has no bearing on the present matter.

As stated above, both of these Defendants violated Plaintiff's Decedent's
Fourth Amendment right to be free from unlawful seizure by seizing Plaintiff's
Decedent without any reasonable suspicion that Plaintiff's Decedent was engaged in
criminal activity or that Plaintiff's Decedent was armed and dangerous. Defendant
Hardaway is equally liable for being an active participant who was integral to the
unlawful seizure.

To demonstrate that the law is clearly established for purposes of the qualified
immunity analysis, a party is not required to cite cases with materially similar facts.

*See Hope v. Pelzer,* 536 U.S. 730, 741 (2002). Rather, the state of the law at the time of the unconstitutional act must be established sufficiently to give "fair warning" to the official that his conduct is unlawful. *Id.* In the context of an unlawful investigative stop, the qualified immunity analysis asks not "whether reasonable suspicion existed in fact, but whether the officer has 'arguable' reasonable suspicion." *Jackson v. Sauls,* 206 F.3d 1156, 1165-66 (11th. Cir. 2000); *see also Williamson v. Mills*, 65 F.3d 155, 157 (11th Cir. 1995); *Swint v. The City of Wadley, Alabama,* 51 F.3d 988, 996 (11th Cir. 1995); *Post v. City of Fort Lauderdale,* 7 F.3d 1552, 1558 (11th Cir. 1993). In determining whether an officer had "arguable reasonable suspicion" to justify an investigative detention, the inquiry is whether "a reasonable officer could have believed" that the detention comported with the Fourth Amendment. *Anderson v. Creighton,* 483 U.S. 635, 637 (1987).

In the instant case, the lead case on investigative detentions, *Terry v. Ohio,* 392 U.S. 1 (1968), was not only clearly established, but also practically infamous, with every law enforcement officer in the country being familiar with the phrase "Terry stop." *Terry* made it clear that an officer could not detain individuals based only on hunches or inchoate suspicions. *See Id.,* at 21. The officer must "be able to point to specific and articulable facts" to support the detention. *Id.* There are

absolutely no specific and articulable facts from which any reasonable officer could have suspected that Plaintiff's Decedent was engaging in criminal activity or was armed and dangerous at the time Individual Defendants seized him. Any reasonable officer would conclude that he could not seize a shirtless individual wearing only shorts, without some other basis for suspecting that the person was armed, such as a weapon-like bulge in the pocket.

Here, none of Plaintiff's allegations, nor the body camera footage,[7] would justify Plaintiff's Decedent's detention in the first place. Moreover, Defendant Hardaway blindly participated in the unlawful seizure and arrest without any arguable reasonable suspicion or probable cause, making him equally culpable. Accordingly, neither of these Defendants is entitled to qualified immunity as to Plaintiff's claims;[8] inclusive of both Plaintiff's federal, as well as Plaintiffs pendent state law claims, as discussed below.

**E.    Both Defendant Hardaway and Defendant Johns are each Liable for the**

---

[7] If even properly considered, and reviewed. *See, infra*, at pp. 7-8.

[8] While the fact that the Grand Jury has now indicted these named Individual Defendants, including Defendants Hardaway and Johns, for murder, falls outside of the initial pleadings in this matter, Defendants' Motion to Dismiss appears intent on downplaying the force and effect of Plaintiff's allegations.  This Court need not follow suit, particularly in light of Defendants' own assertion that contrary to the precedent in this Eleventh Circuit, this Court should nevertheless consider videotape evidence neither referenced in nor contained within the four corners of Plaintiff's Complaint.

**Force Used Against Plaintiff's Decedent Incidental to the Unlawful Seizure**

With respect to Plaintiff's claim of excessive force against Defendants Hardaway and Johns, the Eleventh Circuit has ruled that "where a plaintiff's Fourth Amendment claim is founded on an unlawful arrest, any force used in effecting such arrest is necessarily excessive and need not be proven as a distinct claim; rather the quantum of force and injury goes to the plaintiff's damages." *McCray v. City of Dothan*, 2003 WL 23518420 (11th Cir. 2003) (citing *Jackson v. Sauls*, 206 F.3d 1156 (11th Cir. 2000)); *see also Motes v. Myers*, 810 F.2d 1055, 1060 (11th Cir. 1987) ("It is obvious that if the jury finds the arrest unconstitutional, the use of force and the search were unconstitutional and they become elements of damages for the § 1983 violation."); *Perrin v. City of Elberton*, 2005 WL 1563530 (M.D. Ga 2005) ("Schultz and Reed were not justified in arresting Plaintiff, so they were not justified in using any force against him."). Therefore, because  any force used by Defendant Johns and Defendant Hardaway to arrest Plaintiff's Decedent was *de facto* excessive,[9] neither of these Defendants are entitled to qualified immunity nor dismissal of the unlawful seizure claim. Moreover, neither of these Defendants are entitled to qualified immunity nor dismissal with respect to the issue of excessive force.

---

[9] *See, Jackson*, 206 F.3d at 1170-1171; *Motes*, 206 F.3d at 1060.

As noted in *Jackson*, §1983 claims often employ common law tort principles as "gap-fillers," including the doctrine of foreseeability as it pertains to causation and damages. *See, Jackson*, 206 F.3d at 1168. Because it was clearly foreseeable that an illegal seizure could lead to the use of excessive force during the arrest of Plaintiff's Decedent, both of these Defendants are each liable for all the damages stemming from the seizure, the arrest and the use of force during the arrest.

**F.     State Law Claims (Counts IV, V, VIII)**

As with the constitutional claims for unlawful seizure and excessive force, neither of these Defendants are entitled to dismissal of Plaintiff's state law claims of false arrest (Count V), battery (Count IV) and wrongful death (Count VIII). As to Plaintiff's state law false arrest claim, because Florida state law is essentially the same as federal law on false arrest claims under the Fourth Amendment, Plaintiff, like Defendants,[10] adopts and incorporates the legal arguments made on the federal claim of false arrest. The type of conduct that establishes "wanton and willful disregard of human safety" is more difficult to define. *See Ingram v. Pettit*, 340 So.2d 922, 924 (Fla.1976) (explaining the difficulty of dividing negligence into degrees) - making this more suitable for a summary judgment context.

---

[10] (Motion, p. 27).

With regard to battery under Florida law, in *Thompson v. Douds*, the officers' "use of force did not stop once Magyar was handcuffed. Petry testified in his internal affairs interview that several officers continued to physically hold Magyar down after he was handcuffed and after his legs were bound with rope." *Thompson v. Douds*, 852 So. 2d 299, 303 (Fla. 2d DCA 2003). In denying qualified immunity and statutory immunity to the officers involved, the Second DCA stated: "Because serious force is appropriate for a more serious crime and less force is appropriate for a less serious offense, the fact that Magyar had committed no offense at all militates against the use of any force—much less the force used in this case to effect Magyar's detention." *Douds*, 852 So. 2d at 306 (citing *Lee v. Ferraro*, 284 F.3d 1188, 1198 (11th Cir. 2002) (citation omitted). Moreover, in *Forrest v. Pustizzi*, the Southern District of Florida summarizes an incident as follows: "Accepting Forrest's allegations as true, Forrest did not resist the Officers and obeyed the Officers' commands. Yet Officer Plesher punched Forrest in the face, repeatedly punched him in the head, kicked him in the back, and placed his feet in the center of his back—all while Forrest told the Officers he was in his own home and had done nothing wrong and asked Officer Plesher why he was beating him." *Forrest v. Pustizzi*, 2017 WL 2472537, at *6 (S.D. Fla. June 7, 2017). Analyzing the Forrest Plaintiff's battery claim under state law, the

Southern District states as follows:

> "As a result, the Court must analyze the substance of Forrest's allegations. Given that "the elements and defenses of a battery claim against a law enforcement officer under Florida law are the same as those of an excessive force claim under the Fourth Amendment," the Court's conclusion on the federal excessive force claim, supra, also leads the Court to conclude that Forrest has plausibly stated a claim for state law battery against Officer Plesher. Accordingly, Officer Plesher's motion to dismiss the battery claim is denied."

*Id.*, at *7 (citing *DaSilva v. Lamberti*, 2010 WL 680925, at *1 (S.D. Fla. Feb. 24, 2010) (citation omitted). This eviscerates Defendants' position on state law battery.

Both of these Defendants were active participants in Plaintiff's Decedent's false arrest, and as such is liable for the entirety of Plaintiff's damages under common law even if he did not initiate the arrest. "[I]t appears that this rule, which imposes liability upon a participant [to a false arrest] . . . is the virtually unanimous rule in American jurisdictions." *Schulz v. Lamb*, 591 F.2d 1268, 1271 (9th Cir. 1978) (citing *Restatement (Second) of Torts*, §45A, Prosser, *Handbook of the Law of Torts 47* (4th Ed.)). "If an arrest by a constable is in its inception wrongful, all other constables who act and assist in the continuance of the wrongful imprisonment are responsible for the entire damage thereby caused to the plaintiff, although they had no knowledge of the unlawfulness of the imprisonment and intended to act in the strict discharge of their

official duties." *Id.*

As stated above, neither of these Defendants had any independent knowledge of any crime committed by Plaintiff's Decedent and neither ever sought to obtain information as to why he was being detained and arrested. These Individual Defendants' detention of Plaintiff's Decedent without reasonable suspicion was clearly violative of Florida law. All damages which stem from this unlawful seizure, including the force used by Defendant Johns during the false arrest, are recoverable by Plaintiff against both of these Defendants, allowing individual liability to be imposed against both of them.

As to the immunity afforded to these Individual Defendants under Fla. Stat. §768.28(9), under the facts of this case a jury could determine that both these Defendants actively participated in the arrest without any regard as to why Plaintiff's Decedent was being detained exhibited a "wanton and willful disregard of human rights, safety, or property," allowing individual liability to be imposed against each of these Individual Defendants. At the pleadings stage, this is all that is required in order to deny Defendants' Motion to Dismiss as to both these Defendants.

**G.    It Would Be Improper to Consider 911 Call Audio in this Motion to Dismiss Context**

Contrary to Defendants' position, it is not appropriate for this Court to consider

the 911 call recording in ruling on this Defendants' Motion.  Defendants purport that there exist "two exceptions to this rule, however, which include the incorporation-by-reference doctrine, and judicial notice;"[11] notably, neither of which apply here. Defendants further represent that: "[u]nder the incorporation-by-reference doctrine, a court may consider evidence attached to a motion to dismiss without converting the motion into one for summary judgment if (1) *'the plaintiff refers to certain documents in the complaint*,' (2) those documents are 'central to the plaintiff's claim,' *and* (3) the documents' contents are undisputed." (Motion, p. 4, citing *Bake*r, 67 F. 4th at 1268) (emphasis added). Here, Plaintiff did not cite to the 911 call recording in his Complaint. Defendants' inclusion of this information is improper as the 911 call was not detailed in Plaintiff's allegations. (*See*, Complaint).

Nothing about the caller nor content of a "911" call can be gleaned from the Plaintiff's Complaint. The only reference found in the Complaint is that the officers responded to a "disturbance call." (*See*, Complaint at ¶¶16-19). Further, the contents of this call are by no means 'central to the plaintiff's claim' - and Defendants make no effort to explain how it *is* central, much less go through an (a), (b) and (c) type analysis under *Baker*. Thus, the emphasis these Defendants place on the call and

---

[11] (Motion, at p. 4)

contents thereof seems out of sorts.  Even if we were to take Defendants' sweeping conclusion at face value, to wit; "[h]ere, the information provided in the 911 call was sufficiently reliable for Hardaway and Johns to go to the apartment to investigate potential criminal activity;"[12] the call recording becomes immaterial once Hardaway and Johns arrived at the scene, observed no articulable potential criminal activity, and made unjustified illegal warrantless entry[13] into Plaintiff's Decedent's residence.

Moreover, the continued attempt to utilize alleged evidence apart from Plaintiff's Complaint as a vehicle in this motion to dismiss proceeding and an inapposite standard of review, before any discovery has even occurred in this matter, should not go unnoticed by the Court. Similarly put, the motion to dismiss filed by Defendants cannot be used to circumvent the Federal Rules of Procedure, let alone force the Court to apply an incorrect standard of review to the motion filed by these two Defendants now pending before this Honorable Court.

---

[12] (Motion, p. 7).

[13] There was no arguable reasonable suspicion, much less arguable probable cause on the part of these Defendants, and no exigent circumstances/exception to warrantless entry applied.

## III.   CONCLUSION

No Individual Defendant - not Defendant Hardaway nor Defendant Johns - had arguable reasonable suspicion to seize Plaintiff's Decedent on October 14, 2021. This unlawful seizure led to a false arrest, excessive use of force and the death of Plaintiff's Decedent. Defendant Johns' unjustifiable use of force against Plaintiff's Decedent evinces a willful disregard for human life and creates liability for these damages as claimed by Plaintiff. Defendant Hardaway's active participation in this arrest, willful disregard for the basis of the arrest, and assistance rendered to Defendant Johns during the tasing of Plaintiff's Decedent resulting in Plaintiff's Decedent's death renders him equally liable for these damages. Accordingly, Plaintiff respectfully requests this Honorable Court to summarily deny Defendants' Motion in its entirety.

**\*\*\*\*\***

## <u>CERTIFICATES OF COMPLIANCE</u>

Pursuant to Local Rule 7.1(F), Northern District of Florida, I hereby certify that

the foregoing Motion and Memorandum are <u>7,989</u> words in length.

Respectfully submitted this <u>31st</u>  day of August, 2023

> */s/ Daniel J. Finelli*
> Daniel J. Finelli, Esq.
> Florida Bar No.: 101084
> d.finelli@solowaylawfirm.com
> */s/ Daniel M. Soloway*
> Daniel M. Soloway, Esq.
> Florida Bar No.: 508942
> d.soloway@solowaylawfirm.com
> Soloway Law Firm
> 1013 Airport Blvd.
> Pensacola, FL 32504
> (850) 471-3300 (T)
> (850) 471-3392 (F)
> */s/ Gillis Edward Powell*
> Gillis Edward Powell, Esq.
> Florida Bar No.: 183427
> gillpowell@powelllawfirm.com
> Powell Law Firm
> 422 N Main St
> P.O. Box 277
> Crestview, FL 32536-0277
> Phone: 850-682-2757
> Fax: 850-664-6175
> Attorneys for Plaintiff

## <u>CERTIFICATE OF SERVICE</u>

I HEREBY CERTIFY that on August <u>31</u>, 2023 I electronically filed the

foregoing with the clerk of Court by using the CM/ECF system which will send a

notice of electronic filing to the following:

Jessica E. Keeler, Esq.
Florida Bar No.: 1015660
jkeeler@djmf-law.com
Secondary Email:
jennifer@djmf-law.com
Crag A. Dennis, Esq.
Florida Bar No.: 0361836
craig@djmf-law.com
Dennis, Jackson, Martin & Fontella, P.A
1591 Summit Lake Drive, Suite 200
Tallahassee, FL 32317
(850) 422-3345 (T)
(850) 422-1325 (F)
Attorneys for Defendants BRANDON
HARDAWAY and WILLIAM JOHNS, II

J. Bruce Bowman, Esq.
Florida Bar No.: 0781959
bruce@emeraldcoastlawyers.com
Bowman Law
5535 John Givens Rd.
Crestview, FL 32539
(850) 428-1755 (T)
(850) 601-5494 (F)
Attorney for Defendant, EVAN REYNOLDS

Zackery A. Scharlepp, Esq.
Florida Bar No.: 0085374
zascharlepp@coppinsmonroe.com
Secondary Emails:
jclark@coppinsmonroe.com
cmarchena@coppinsmonroe.com
Nicholas A. Lecakes, Esq.
Florida Bar No.: 104771
nlecakes@coppinsmonroe.com
Coppins Monroe, PA
1319 Thomas Drive
Tallahasse, FL 32308
(850) 422-2420 (T)
(850) 422-2730 (F)
Attorneys for Defendants STEPHEN
MCCOSKER and CITY OF
CRESTVIEW, FLORIDA

*/s/ Daniel J. Finelli*
Daniel J. Finelli, Esq.